Masters *v.* Alexander, Appellant.

Argued December 1, 1966. Before Bell, C. J., Mus-
manno, Jones, Eagen, O'Brien and Roberts, JJ.

*Lynn L. Detweiler*, with him *Swartz, Campbell and
Detweiler*, for appellant.

*David Cohen*, with him *Andrew F. Napoli, Daniel
R. Sherzer*, and *Cohen and Verlin*, for appellee.

Opinion by Mr. Justice Musmanno, January 20,
1967:

Ronald J. Masters, age 12 years and five months,
was riding his bicycle at night on what is known as
the "shoulder" of Bristol Pike, Bensalem Township,
Bucks County, when he was struck by an automobile
being driven by Wade Alexander, Sr., traveling in an
opposite direction. The impact sent the boy flying
through the air, hitting the automobile aerial and
windshield, the violent contact with metal and glass
inflicting skull fracture, optic nerve disablement, mul-
tiple facial scarring and other grave and permanent in-
juries. In the ensuing trespass action against Alex-
ander, the jury returned a verdict in favor of the minor

plaintiff in the sum of $100,000 and $3,400 for the father. The defendant has appealed, asking for judgment n.o.v., or, in the alternative, a new trial.

Bristol Pike is 30 feet wide, divided down the center by a white line, thus assuring each lane of traffic a width of 15 feet. On either side of the highway runs a berm or shoulder 2 feet wide. The berm is not properly part of the highway and is intended, like the saucer to the cup, to be useful only when, in the event of a jar, jerk or other unexpected movement, the coffee spills or the automobile veers beyond its prescribed width of travel.

Ronald Masters was accompanied that night by his brother Robert who was riding a bicycle ahead of him. They were traveling on the southbound side of the road, that is, against the flow of traffic, but, as indicated, on the berm which permitted them to see all vehicles coming toward them. Robert saw the defendant's automobile approaching and drove off the berm, thus escaping collision. Ronald apparently was not quick enough to execute the same maneuver and was hit, while still on the berm. The defendant, being where normally he had no right to be, explained his presence on the berm by stating that a passing car threw its headlights into his eyes and this required him a "second" "to adjust to that." He testified that the boy on the bicycle did not come into his line of vision until he was 10 feet away from him. In a deposition made by him prior to trial he said he did not see the boy at all before the accident.

The defendant's explanation does not explain why he could not perceive the bicycle and its rider at a distance further away than 10 feet, or not at all. One of the defendant's witnesses, who was riding in a car behind the defendant, at a distance from defendant's car of about 100 feet, stated he had no difficulty in detecting the bicycle with its rider before the crash.

It could well be that the defendant failed to note what was on the berm lining Bristol Road until he was practically on top of the bicycle occupying that berm, not for the reason advanced by him at the trial, but for a more cogent reason, namely, he could not clearly discern objects at night because of optical insufficiency. Two and a half months prior to the accident an ophthalmologist had rated vision in the defendant's right eye at 20/200 and at 20/100 in the left eye, as against 20/20 normal vision. Thus the defendant's right eye, the one closer to the berm on which Ronald was cycling, had about 80% deficiency in sight power and the left eye had 50% deficiency.

About six weeks after the accident the defendant underwent an operation for the removal of a cataract on his right eye. The eye examination which was made just before the operation revealed "both lenses are foggy and cloudy." The examining doctor said that, because of this condition, he could not see into the eye. It is only logical to conclude that if the doctor could not see into the eye, the patient could not see out of it.

Dr. Greenfield, who examined the defendant in September, 1960, said that Alexander's eyesight was practically just as bad two months before as then. The two-month period would, of course, include the date of the accident, which was July 28, 1960.

The defendant could not but have known that the unfortunate imperfection in his eyesight created a hazard for himself and others when he was at the wheel of an automobile. And to compound the hazard, the defendant was not wearing his corrective glasses the night of the accident. It cannot be said that Alexander was unaware of the curtain of cataract descending over his right eye. He testified that when he visited his eye doctor in the spring of 1960 the doctor had told him "it looked as if there could be a cataract forming." The report of the examination made at the time of the

operation showed his eye condition to have been much worse than he had guardedly described it at the trial. The report read: "This blurring and difficulty with light has increased over the past 3 to 4 years, and the patient has come to the hospital to have the cataract removed. The patient states he also has a cataract beginning in his left eye."

The defendant does not attempt to explain away his visual handicap but contents himself, through his counsel, with the argument that he had not had any accident before, and this proves that the tragedy visited on Ronald Masters was not his fault. Defendant's counsel argues that: "It is . . . inconceivable that with seriously impaired vision he [the defendant], could have driven 9,000 miles annually (this includes only his trips to and from work), half of it at night after dark, without an accident except the two which had nothing to do with poor vision." One can take with a grain of speedometer salt this statement about 9,000 miles' driving without accident (except two), but, even accepted at earshot value, this does not absolve the defendant. Everyone knows that a cracked pitcher can go to the well once too often.

Was the defendant, under all these circumstances, negligent, and if so, did his negligence visit on Ronald the tragic injuries heretofore only partially alluded to? Even if the defendant had had good eyesight, he still could have been guilty of negligence—he had 15 feet latitude within which to avoid mounting the shoulder of the road. Since Ronald was visible to others when he was at least 110 feet away from them, the defendant, if he had been driving with care and at an appropriate speed, should have been able to stop his car within the scope of his headlights. This Court stated in *Enfield v. Stout,* 400 Pa. 6: "For many years under the law of Pennsylvania, it has been the rule that the driver of an automobile on a public highway must be

alert to have it under such control that he can stop it within the 'assured clear distance ahead.' This requires that the driver operate his automobile at such a rate of speed and in such a manner that he can always stop it within the distance that he can clearly see. . . By this is meant the range of the driver's vision, which, of course, in darkness is the scope of his headlights."

But in this case we have more than a miscalculation at the wheel at the moment of crisis. We have, as indicated, the charge that negligence stepped into the car and took a position behind the wheel even before the ignition set the engine turning. The jury was properly instructed on this phase of the case and, if it found that the accident would not have happened if the defendant had had the proper optical equipment for driving, this fact, in itself, would have been enough to sustain the charge of negligence against the defendant. To drive with vision so defective that one cannot detect a bicycle until within 10 feet of it is an act of negligence as flagrant as driving with both hands off the wheel. In *Bert v. Walker*, 146 Pa. Superior Ct. 50, the Superior Court held that the defendant motorist was guilty of negligence in driving when "the weather was misty and visibility was poor." How much more aggravated this negligence is bound to be when the motorist with defective vision moves forward in a constant fog which envelopes him on all sides, endangering everybody that may happen to be in his immediate vicinity on or off the highway.[1]

---

[1] The Vehicle Code, §604, 75 P.S. §604, authorizes the Secretary of Highways to deny operating privileges to an applicant who is suffering from a "weakness or disability in vision which . . . will prevent such person from exercising reasonable and ordinary control over a motor vehicle or tractor." It was held in *Goldman v. N.Y. Rys. Co.*, 185 App. Div. 739, that where a streetcar motorman experienced two dizzy spells but continued to run the streetcar un-

The defendant here denies he was negligent and adds that he is entitled to judgment n.o.v., on the alleged contributory negligence of the minor plaintiff. Indeed, it would seem that he treads more forcibly on this pedal of argument than on the asserted lack of negligence on his part. In Pennsylvania the law has always been that children between the ages of 7 and 14 are presumed incapable of negligence. In *Patterson v. Palley Mfg. Co.*, 360 Pa. 259, we said: "The care and caution required of a child is measured by his capacity to see and appreciate danger and he is held only to such measure of discretion as is usual in those of his age and experience; this being necessarily a varying standard, the question is ordinarily one for the jury and not for the court."

The defendant was obviously aware of this rule of law because he asked the court to charge that: "minors between the ages of 7 and 14 are presumed incapable of negligence, but such presumption is rebuttable and grows weaker until the 14th year is reached." Thus, considerable evidence was presented to the jury as to Ronald's schooling, intellectual attainments and habits, so that the jury had ample biographical data on which to base their conclusions as to whether he had the capacity to see and appreciate the specific danger presented the night of the fateful encounter. We cannot say from the record that the jury erred in reaching its eventual conclusion.

But the defendant contends that, apart from the lad's unusual alertness which should have informed him of the danger of traveling at night on a bicycle, he was guilty of contributory negligence as a matter of law because he was violating a statute as he cycled on

---

til he fainted, a judgment for defendant would be reversed on the ground that the motorman had warning, and, therefore, knowledge of his weakness.

Bristol Road. Ronald's bicycle was not equipped with a headlight although it did have a reflector at the rear. This, the defendant presses, constitutes a violation of §801 of The Vehicle Code, which provides that bicycles "upon a highway" shall be "equipped with a lighted lamp."[2] Is a berm part of the highway? In general lay language it probably is, but, in the application of a statute, where a disadvantage or harm may result from a supposed infraction of a law, the words must be interpreted strictly. In that respect, a berm is not part of the highway. It is a protective device as a short, light fence paralleling a roadway could be. A berm, although not an obstructive barrier, is a distinctive visual boundary to the highway. A person walking or cycling on a berm has the right to assume that automobiles will stay within the boundaries of the cartway and thus he is not required to be equipped to parry the sudden swerving of a vehicle off the cartway. In *Gatens v. Vrabel*, 393 Pa. 155, 159, this Court, in deciding the issue there involved, distinguished between the berm and the cartway.

However, even if, arguendo, it should be assumed that the jurisdiction of The Vehicle Code extends to include the berm or shoulders of the road, a violation of a specific provision of the Code could operate as a bar to recovery, on the basis of contributory negligence, only if the violation in itself contributed to the happening of the accident. We said in *Wermeling v. Shattuck*, 366 Pa. 23, 27 that: "The violation of a mandatory provision of The Vehicle Code has been held to be negligence and, therefore, actionable without more if it happens to be *the proximate cause of the injury in suit."* (Emphasis supplied.)

---

[2] Act of April 29, 1959, P. L. 58, §801, as amended, 1959, July 13, P. L. 533, §1, 75 P.S. §801(a), (h).

The absence of the headlight on Ronald's bicycle was not the proximate cause of the accident on Bristol Road. The collision occurred because Alexander went over to the berm where he was not authorized to go and because he did not see, as he should have seen, if he had exercised proper care and had possessed the visual power normally expected of a careful motorist, what was on the berm. As we have already pointed out, the bicycle was seen by another motorist traveling in the same direction as Alexander so that it became a question of fact for the jury to determine whether Alexander should not also have seen Ronald, and, seeing him, should not have avoided striking him.

The defendant cites the case of *D'Ambrosio v. Philadelphia,* 354 Pa. 403, in support of his position that violation of a statute ipso facto establishes negligence. But the facts there were wholly dissimilar from the ones here. The Vehicle Code[3] prohibited riding on the tail-gate of trucks. The minor plaintiff was hurt because while riding the tail-gate of a truck, he was bounced off when the truck struck a hole in the road. This Court said: "His acts in violation of the statute were negligent and were a substantial factor or the legal or proximate cause of his injury."

In the instant case, the minor plaintiff did not fall off the bicycle because he had no light attached to the handlebars, the bicycle did not go into a hole because of the absence of self-illumination. The illumination which was absent from the bicycle was supplied by the headlights of the defendant's car which lit up the bicycle in a glare that made the bicycle as conspicuously visible as an opera singer on a concert stage under a spotlight. If the facts were as related by the plaintiff's evidence, and we must so assume because the jury, following the instructions of the Court, brought

[3] Act of May 1, 1929, P. L. 905, §1023, as amended by Act of June 27, 1939, P. L. 1135, 75 P.S. §632.

in a verdict for the plaintiff, we can only conclude that the absence of the lamp on Ronald's bicycle was not the proximate cause of the misfortune which befell him.

This Court said, in *Lane v. Mullen, Inc.,* 285 Pa. 161, 164, that: "Where, as here, the determination is that the failure to heed the statute did not bring about the result complained of, the statute drops out of the factors to be considered. The general principle is that the violation of a statute will not create a liability where it is not the efficient cause of the injury."

Failing in obtaining judgment n.o.v., the defendant urges that he is entitled to a new trial on the ground of excessiveness in the verdict. The injuries inflicted on Ronald are harrowing to contemplate in their intrinsic severity and their permanent effect on the child. In this respect we quote with approval from the opinion of the lower court: "The plaintiff sustained the following injuries: compound comminuted depressed fractures of the right frontal lobe of the skull; laceration of the dura and arachnoid coverings of the brain with leakage of the spinal fluid; removal of part of the brain tissue; fracture of the right orbital area and levator muscle which controls the upper eyelid of the right eye; ptosis of the right eyelid; injury of the optic nerve of the right eye; multiple scarring of the face and head with a deformity and depression of the right frontal area of the skull over the eye; two operations on the skull requiring removal of brain tissue and placement of artificial material in place of the skull; three operations to the right eye. The injury to the right eye and the resulting ptosis is permanent, as is the removal of the brain tissue.

"There is substantial medical evidence as to the effect of the destruction of a portion of the plaintiff's brain. The neurosurgeon who treated minor plaintiff following the accident testified to the condition of Ronald Masters upon admission to the Lower Bucks

County Hospital: '. . . At that time he had sustained a deep laceration of the right side of his head in the front which . . . had penetrated through the bone, through the covering of the brain, and into the brain itself. He also had brain tissue oozing out of the opening which this injury had made, and fluid which normally covers the brain was also oozing out in large, rather large amounts at that time.' He further testified that: 'The brain itself, which was macerated by the injury was removed—that portion of it which was protruding through the hole.' In describing the final step of the first operation performed on minor plaintiff, he stated: '. . . the final step was to try to get something that looked half way decent in the way of a person's front part of the skull, because as you can well imagine the whole front part of the skull—particularly the area above the eye which is what makes a person look like what he does—was completely destroyed. . .'

"Testimony established that, while plaintiff had been an excellent student before the accident, on his return to school following that occurrence, his grades fell off and he was finally expelled while in the 10th grade. His resulting poor and defective memory following this accident has made him unable to do or carry through anything but the most menial form of work. Dr. Sagan testified that '. . . in view of the fact that he had these disabilities, shall we say, this inability to concentrate, will affect his employment abilities. In other words, he will be limited as to the types of work he can do. . . . Once the brain cells are gone they are gone forever. They cannot be replaced or regenerated.' His loss of earning capacity will be permanent.

"The minor plaintiff also sustained severe permanent disfigurement due to this accident. For instance, in testifying as to his examination in May of 1961, Dr. Sagan said: 'On that occasion Ronald had a

large defect in the frontal part of the head where the bone had been removed. . . This area here was devoid of any bone, was an open area. You could see his brain pulsating underneath it, pumping and beating as it normally does. What I did was to put a plate in there to cover that area so that the pulsation of the brain would not be visible, and also so he would have some protection over the front part of his brain from any further injury. At that particular time it was noted that the lid, the upper lid on the right side dropped as compared to the lid on the left side, and for that reason I asked Dr. Al Smith, an eye surgeon, to see if this could be fixed, because, I felt this was outside of my particular type of work.'

"Dr. Alvin H. Smith, Chief Opthalmologist at the Lower Bucks County Hospital, testified he performed three operations on Ronald Masters following this accident. In his medical opinion Ronald had suffered an injury as a result of this accident to the optic nerve in his right eye and that, therefore, the right eye could not be corrected to better than 20/30 with glasses. Dr. Smith further testified that even with the operations the drooping of the right eyelid persisted.

"In addition to the disfigurement, permanent lessening of his earning capacity, physical and mental pain and discomfort, the minor plaintiff has sustained a severe personality change which has permanently affected his future.

"It is hard to judge what a ruined life is worth in dollars and cents. Viewing all the above factors which the jury considered in arriving at its determination of damages, this court believes that the verdict was just and fair and in no way excessive or shocking."

It may be added that the defendant offered no medical evidence to contradict the plaintiff's evidence as to his injuries.

Judgment affirmed.

Mr. Chief Justice Bell, Mr. Justice Jones, Mr. Justice Eagen, Mr. Justice O'Brien and Mr. Justice Roberts concur in the result.