SIZEMORE v SMOCK

Docket No. 79826. Argued October 8, 1987 (Calendar No. 6). Decided
    April 26, 1988.

Valera S. Sizemore brought an action in the Genesee Circuit
    Court against Bruce K. Smock and Peter Alumbaugh, Inc.,
    seeking damages for injuries sustained when she was fifteen
    years old and was struck by an automobile owned by Alum-
    baugh and driven by Smock. Veda K. Sizemore, Valera's
    mother, joined in the action, claiming loss of companionship,
    society, and protection of her daughter. The court, Judith A.
    Fullerton, J., granted summary judgment for the defendants
    against Veda K. Sizemore, holding that a claim by a parent for
    the loss of companionship and society of a child is not recog-
    nized in Michigan. The Court of Appeals, BRONSON, P.J., and
    ALLEN and CHERRY, JJ., reversed in an opinion per curiam
    (Docket No. 82973). The defendants appeal.

In an opinion by Chief Justice RILEY, joined by Justices
    LEVIN, BRICKLEY, CAVANAGH, and GRIFFIN, the Supreme Court
    *held:*

The common law of Michigan does not recognize an action by
    a parent for the loss of a child's society and companionship as a
    result of the negligent injury of the child. Any decision to
    extend claims for loss of consortium to include a negligent
    tortfeasor's liability for loss by a parent of a child's society and
    companionship should be determined by the Legislature.

1. An action for loss of consortium is somewhat of an anom-
    aly. Generally, a negligent tortfeasor's liability extends only to
    an obligation to compensate a person directly injured. Although
    it is eminently foreseeable that a negligent injury of one party
    may result in adverse consequences that affect others, the law
    cannot redress every injury, and the determination of where to
    draw the line of liability essentially is a question of policy to be
    determined by the Legislature.

2. Important public policy considerations weigh heavily

REFERENCES
Am Jur 2d, Parent and Child § 97.
Parent's right to recover for loss of consortium in connection with
    injury to child. 54 ALR4th 112.

against further extension of claims for loss of consortium to include a parent's loss of a child's society and companionship. The wisdom of awarding monetary damages as compensation for the intangible and sentimental elements of a claim for loss of consortium is to be questioned, as is the efficacy of such an award to deter negligent conduct or to adequately redress the loss. The intangible character of the loss also raises difficulty regarding the proper measurement of damages and creates an unwarranted risk of allowing double recovery. Increasing the load on the reparation system by recognizing causes of actions in secondary tort victims in addition to the primary victim's action likely will increase insurance premiums, decrease participation in the system by marginal insureds, and decrease the amount that an insurer will willingly pay to a primary victim, thereby increasing litigation.

Justice GRIFFIN, concurring, stated that the logic and policies which support the Court's decision are equally applicable in the case of a child's claim for loss of parental society and companionship. Thus, he would indicate that the inconsistent holding in *Berger v Weber,* 411 Mich 1 (1981), which recognizes such an action on the part of a child, should no longer be regarded as precedent.

Reversed.

Justice ARCHER, dissenting, stated that no principled distinction between a child's cause of action for loss of parental consortium and a parental action for loss of filial consortium is allowed by *Berger v Weber,* 411 Mich 1 (1981). Because the reasoning of *Berger* was logical and was based on valid policy considerations, stare decisis requires that *Berger* be adhered to as binding precedent, thereby creating a cause of action in Michigan on behalf of a parent for a negligent injury of a child that results in loss of consortium.

Justice BOYLE, dissenting, stated that a parent should be able to maintain a cause of action for loss of filial society and companionship when a child is severely injured. Society accords a unique value to the relationship of parent and child. That relationship suffers real damage as a result of such injuries. That the value is intangible should not preclude recognition of the claim; nor should recognition be deferred to the Legislature. Rather, recognition of a claim for interference with the relationship would acknowledge the means by which society transmits the judgment that the value involved is worthy of protection.

155 Mich App 745; 400 NW2d 706 (1986) reversed.

NEGLIGENCE — PARENT AND CHILD — LOSS OF CONSORTIUM.
    A claim by a parent for the loss of a child's society and compan-
        ionship where the child has been negligently injured is not
        recognized under the common law of Michigan.

*Beltz & Nickola* (by *C. Robert Beltz*) for the
plaintiff.

*Gromek, Bendure & Thomas* (by *Nancy L. Bosh*
and *Neal C. Villhauer*) for the defendants.

RILEY, C.J. In *Berger v Weber,* 411 Mich 1; 303
NW2d 424 (1981), this Court recognized a cause of
action on the part of a child for loss of parental
society and companionship when a parent is negli-
gently injured. Today, we are asked to decide the
related question whether the common law of this
state shall recognize a parent's cause of action for
loss of a child's society and companionship when
the child has been negligently injured. We hold
that the common law of this state does not recog-
nize a parent's action for loss of a child's society
and companionship and that any decision to fur-
ther extend a negligent tortfeasor's liability for
consortium damages should be determined by the
Legislature.

I

The facts of this case were concisely and accu-
rately set forth by the Court of Appeals:

    On October 28, 198[1], an automobile struck
    fifteen-year-old Valera Sizemore as she was riding
    her bicycle. The automobile was driven by defen-
    dant Smock and owned by defendant Peter Alum-
    baugh, Inc. Valera Sizemore sustained serious in-
    juries as a result of the accident.
    Valera subsequently filed suit in Genesee Circuit
    Court to recover for her injuries and her mother,
    Veda Sizemore, joined in the action. As relevant to

this appeal, plaintiffs' complaint made the following claim for damages against the defendants on behalf of Veda Sizemore:

"11. As a result of the above described accident, the Plaintiff, Veda K. Sizemore, sustained the loss of the companionship, society and protection of her daughter as well as the necessity to care for her daughter's physical needs, and to provide medical care and treatment for her and parental concern regarding the serious injuries her daughter sustained."

Defendants promptly moved for summary judgment pursuant to GCR 1963, 117.2(1) against Veda Sizemore, asserting that no Michigan statute or case recognizes a parent's claim for loss of companionship and society when a child is negligently injured. As previously indicated, the trial court agreed and granted defendants' motion. The court also determined that Veda did not have a cause of action for attending to her child's medical needs, because she is compensated through the no-fault insurance act for such expenses, making a separate action unnecessary. Plaintiff Veda Sizemore now appeals as of right.[1]

Relying on this Court's decision in *Berger, supra,* the Court of Appeals reasoned that Michigan law sufficiently favored the parent-child relationship to allow a parent to recover for loss of companionship and society of a negligently injured child and reversed the trial court's ruling. This Court granted defendants' application for leave to appeal, limited to the issue whether the common law of this state should recognize a parent's cause of action for loss of companionship and society of a negligently injured child.[2]

[1] *Sizemore v Smock,* 155 Mich App 745, 746-747; 400 NW2d 706 (1986).

[2] *Sizemore v Smock,* 428 Mich 873 (1987).

II

At early common law, all rights to recover damages stemming from injuries to family relational interests were held by the father under the doctrine of paterfamilias.[3] The father's rights were developed by analogy to the master-servant relationship and predicated on the archaic notion that family members were legally comparable to servants and that women retained no separate legal identity upon marriage.[4] Recovery was initially limited to the pecuniary value of lost services and medical expenses.[5] However, the action was eventually enlarged to allow the husband to recover loss of certain intangible elements, including the sentimental value of impaired sexual relations and loss of the wife's society and affection.[6]

Recognition of the intangible aspects of the husband's consortium action was initially limited to actions involving intentional interference with the marriage relationship, e.g., actions for enticement or harboring (inducing a wife to live apart from her husband), criminal conversation (adultery), and alienation of affections.[7] The action was eventually extended to allow husbands to recover for loss of his wife's consortium resulting from negligently inflicted injury as well.[8]

Under the common-law rule, the father was

---

[3] See Williams, *The child's action for loss of society and companionship: The next logical step,* 62 Chicago-Kent L R 55, 56 (1985).

[4] *Id.* See also Prosser & Keeton, Torts (5th ed), § 125, p 931, and *Montgomery v Stephan,* 359 Mich 33, 38-39; 101 NW2d 227 (1960).

[5] Prosser & Keeton, n 4 *supra.*

[6] *Id.* Presently consortium is defined as love, companionship, affection, society, comfort, sexual relations, services, solace, and more. *Berger, supra* at 13, n 5.

[7] *Berger, supra* at 25 (dissenting opinion of LEVIN, J.). See also Popescul, *Action per quod consortium amisit,* 43 Sask L R 27, 28-33 (1979).

[8] *Id.*

similarly entitled to compensation for the lost services of his children and medical expenses incurred as the result of tortious injury to them.[9] However, the claim for loss of a child's services did not expand to include the intangible aspects of the consortium claim as it did with regard to the wife.[10]

A few courts questioned survival of the husband's consortium action with the passage of socalled married women's acts which recognized the separate legal existence of married women and accorded them the right to retain their own earnings and property.[11] It was argued that if the husband's action for pecuniary loss was eliminated, the sentimental aspects of the action should also fall.[12] However, notwithstanding the consortium action's roots in the master-servant analogy, most courts rejected that contention and determined that the husband's claim was primarily based on the marital society of his wife and continued to allow recovery for the intangible aspects of the consortium claim.[13]

The first significant extension of the consortium action occurred in 1950 in the landmark case of *Hitaffer v Argonne Co.*[14] In that case, the United States Court of Appeals for the District of Columbia became the first court to recognize a wife's action for loss of consortium when her husband was negligently injured by a third-party tortfeasor.

---

[9] Prosser & Keeton, n 4 *supra* at 934.

[10] *Id.*

[11] Following passage of the married women's act in Michigan, this Court held that neither spouse could maintain an action for loss of consortium. See *Blair v Seitner Dry Goods Co,* 184 Mich 304, 313-314; 151 NW 724 (1915).

[12] Harper, James & Gray, Torts (2d ed), § 8.9, p 551.

[13] *Id.*

[14] *Hitaffer v Argonne Co,* 87 US App DC 57; 183 F2d 811 (1950), rev'd in part on other grounds sub nom *Smither & Co, Inc v Coles,* 100 US App DC 68; 242 F2d 220 (1957), cert den 354 US 914 (1957).

Following the federal lead in *Hitaffer*, this Court, in a four-to-three decision, recognized the consortium action for both spouses in *Montgomery v Stephan*, 359 Mich 33; 101 NW2d 227 (1960). The *Montgomery* Court, over a strong dissent, rejected arguments that the consortium action should not be recognized because the damages were too remote and uncertain, because there was a danger of allowing double recovery, and because of the contention that various policy and procedural considerations made the determination one more appropriately left to the Legislature. As will be seen, these are among the same considerations confronted by other courts in deciding whether to extend the consortium action to the parent-child relationship.

A further and perhaps more significant expansion of the consortium action occurred in 1975 when the Supreme Court of Wisconsin extended the action to parents to recover for their loss of society and companionship of a negligently injured child. *Schockley v Prier*, 66 Wis 2d 394; 225 NW2d 495 (1975). The *Schockley* court opined that the parent-child relationship could no longer be analogized to the master-servant relationship and that in modern society, children are no longer valued for their services or earning capacity, but rather for their society and companionship. *Schockley* was the seminal case in a slowly developing trend towards extending the consortium action to the parent-child relationship.

In *Berger, supra,* this Court similarly took the first step towards extending the consortium action to the parent-child relationship and recognized a child's action for the loss of companionship and society of a negligently injured parent.

In deciding to recognize the child's claim, the *Berger* Court rejected various arguments and pol-

icy considerations as valid reasons to decline to further extend the action. Among the arguments rejected was the contention that there are significant distinctions between the marital relationship and the parent-child relationship which call for different treatment. The Court concluded that although the sexual relations aspect of spousal consortium was absent in a child claim, "[t]he other elements—love, companionship, affection, society, comfort, services and solace—are similar in both relationships and in each are deserving of protection." *Id.* at 14. Other policy considerations raised by the defendant, including the added burden on the court system by increased litigation, a multiplicity of actions arising out of a single tortious act, the increased economic burden to the public in general due to increased insurance premiums, the remoteness and speculative nature of the damages, were similarly discounted.

The dissent in *Berger* took cognizance of the legitimacy of the child's interest in parental society and companionship, but nevertheless was persuaded that upon balancing the interest at stake against the various policy considerations implicated, the consortium action should not be extended beyond the marital relationship.

The matter before us today requires us to independently reexamine the various arguments and policy considerations which closely divided the Court in both *Berger* and *Montgomery.*

III

The appellants in the instant case contend that in light of the consortium action's dubious historical evolution it is an anomaly in the law and that recognition of a parent's or child's claim for loss of society and companionship resulting from negli-

gent injury to another constitutes an unwarranted extension of tort liability. Appellants further stress the various public policy considerations raised by the dissent in *Berger* and maintain that the line of liability must be drawn at *Berger,* although they believe there is little justification to support the consortium action in any context.

The appellee and the dissent, on the other hand, argue that the Court of Appeals decision in the instant case, recognizing the parental consortium action, was a logical extension of *Berger* and that it is warranted by the need to protect the parent-child relationship and the reality of the genuine sentimental loss suffered by a parent when a child is tortiously injured. In his dissent, Justice ARCHER maintains that the lack of any meaningful distinction between the interests being protected by the cause of action recognized in *Berger* and the interests appellee seeks to have protected here, mandates recognition of the parental consortium action.[15]

The plaintiff's argument has compelling sympathetic and logical appeal. Justice ARCHER relies heavily on the reciprocal nature of the intangible elements protected by the consortium claim in the parent-child context in support of his position.[16]

[15] Although Justice ARCHER acknowledges that *Berger* does not directly bind this Court to recognize the parental consortium claim, he nevertheless seems to suggest that our failure to recognize the parent's claim somehow constitutes a departure from our obligation to adhere to the doctrine of stare decisis (*post,* p 300, n 1, pp 307-308). However, the doctrine of stare decisis, as it relates to *Berger,* has no bearing on the Court's decision in this case. The question presented here, although closely related to the question decided in *Berger,* is clearly not the same one. Here, we must consider whether to recognize an entirely new cause of action that was not considered by the *Berger* Court and will result in imposing an additional level of liability on negligent tortfeasors beyond that recognized in *Berger.*

[16] Justice ARCHER maintains that in order to decline to recognize the parental consortium action, this Court must either overrule *Berger* or distinguish between the rights of a child to parental

We agree that any attempt to draw a meaningful distinction on the basis of the sentimental aspects of the consortium claim between the parties in the parent-child relationship would be specious and unavoidably futile. Nevertheless, when this Court is confronted with the task of determining whether to expand the scope of a negligent defendant's liability and the conditions of recovery, it must look beyond logical analogies and balance the arguments in support of recognizing a new cause of action against public policy considerations and the social consequences of imposing yet another level of liability.[17]

Similarly, Justice BOYLE rests her argument in part on the unique value inherent in the parent-child relationship and the importance to society in protecting it. We do not in any way quarrel with this notion. However, we believe that there are compelling conceptual and public policy considerations that militate against this Court further extending a negligent tortfeasor's liability by recognizing a parent's action for loss of society and companionship of a negligently injured child. This determination is not in any way intended to denigrate the unique value inherent in protecting the parent-child relationship.

The consortium action is somewhat of an anomaly in the law of tort in that it is generally the rule that a negligent tortfeasor's liability only extends to an obligation to compensate the person directly injured.[18] Although it is eminently foresee-

consortium and those of a parent to filial consortium. There is no authoritative basis for this assertion. Indeed, this Court would be remiss if it neglected to consider the various policy considerations implicated by the question presented in reaching our decision. See *Berger, supra* at 23 (dissenting opinion of LEVIN, J.).

[17] *Id.*

[18] See *Siciliano v Capitol City Shows, Inc,* 124 NH 719, 724-725; 475 A2d 19 (1984).

able that a negligent injury to one party will result in adverse consequences that affect others to one degree or another, the law cannot redress every injury, and the determination of where to draw the line of liability is essentially a question of policy. Having extended the scope of liability in *Berger, supra,* to cover the intangible loss suffered by a child whose parent has been negligently injured, we are now asked to extend it one more step to redress the parent's similar loss when the child is negligently injured.

Foreseeability of injury alone does not mandate recognition of a cause of action.[19] Social policy must intervene at some point to limit the extent of one's liability.[20] In *Borer v American Airlines, Inc,* 19 Cal 3d 441, 446; 138 Cal Rptr 302; 563 P2d 858 (1977), the California Supreme Court, en route to refusing to recognize a child's consortium action, observed:

> As stated by Judge Breitel in *Tobin v Grossman* (1969) 24 NY2d 609, 619 [301 NYS2d 554, 249 NE2d 419]; "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree."

We believe that important public policy considerations weigh heavily against any further extension of the consortium action by this Court. Initially, we question the wisdom of awarding monetary damages to compensate one for a loss of the intangible and sentimental elements of the consortium claim. The efficacy of such an award to either deter negligent conduct or adequately redress the loss suffered is highly questionable. To the extent

---

[19] See *Berger, supra* at 28-29 (dissenting opinion of LEVIN, J.).

[20] *Borer v American Airlines, Inc,* 19 Cal 3d 441, 445-446; 138 Cal Rptr 302; 563 P2d 858 (1977).

that the system of tort liability is designed to make one more socially responsible vis-á-vis their relationship with others, it is unlikely that any secondary liability imposed beyond the liability exposure to the primary victim of an injury will do anything to further that objective. Moreover, monetary compensation will not enable the parents to replace the loss they have suffered. Although tort law permits recovery for other intangible injuries, e.g., pain and suffering of the primary injured party, the wisdom of compensating one for such injuries is less compelling when the injury is remote, the loss is intangible, and the liability is secondary.

The intangible character of the loss also raises difficulty with the proper measurement of damages[21] and creates an unwarranted risk of allowing double recovery. As noted by the dissent in *Berger, supra,* the primary victim of a negligent injury can recover for a broad range of intangible losses which includes losses to the family relational interest.[22] The *Berger* dissent further noted:

> When a close link between two persons is disrupted, it is difficult to distinguish the injury suffered by each. As the California Supreme Court noted: "[T]o ask the jury, even under carefully drafted instructions, to distinguish the loss to the mother from her inability to care for her children from the loss to the children from the mother's inability to care for them may be asking too much." To permit a child to recover for loss of an injured parent's society and companionship while the parent is also compensated for injury to the relationship creates a substantial risk of double recovery because of the difficulty of distinguishing the respective losses of the parties. [*Berger, supra* at 36 (dissent of LEVIN, J.).]

---

[21] See *Berger, supra* at 35-36 (dissenting opinion of LEVIN, J.).
[22] *Id.* at 37-38.

We believe this observation is equally applicable
to the parent's claim and that it similarly creates
a significant risk of double recovery.

The social consequences and economic burdens
resulting to the public from recognition of an
additional cause of action also persuade us that
the line of liability should not be extended any
further. Realistically, the burden of payment for
additional consortium awards will be borne by the
general public through the assessment of increased
insurance premiums which in turn creates the
danger that many persons may choose to go unin-
sured. The *Berger, supra,* dissent relevantly noted:

> There is a limit to the range of injuries and the
> dollar amount of recovery which can be spread
> across society through the interaction of the tort
> litigation and insurance systems. Increasing the
> load on the reparation system by recognizing
> causes of action in secondary tort victims in addi-
> tion to the primary victim's action must increase
> insurance premiums, decrease participation in the
> system by marginal insureds, and perhaps de-
> crease the amount that an insurer will willingly
> pay to the primary victim, thereby increasing
> litigation. [*Id.* at 41.]

The cost of administering the system to deter-
mine and pay additional consortium awards will
also undoubtedly be increased by the multiplica-
tion of claims as will the expense of settling or
litigating them.

In his dissent, Justice ARCHER acknowledges
that a "very difficult policy question" is presented
here (*post,* p 306), and suggests that there is a
better point at which the line of liability for con-
sortium damages should be drawn (*post,* p 306).
However, the dissent fails to suggest where that
point should lie on the continuum of liability.

We similarly fail to see where such a point of demarcation should more logically begin. Grandparents, siblings, and others with close emotional ties to a negligently injured plaintiff undoubtedly would be able to posit an argument just as logical and sympathetic as the parent or child for protection of their consortium interests by recognition of similar action in their favor.[23] However, for the policy considerations we discuss here, we believe the limit of one's liability should not be extended any further.

Plaintiff and the dissent also contend that the allowance of filial consortium damages under this state's wrongful death act, MCL 600.2922; MSA 27A.2922, requires similar recognition of such damages when the negligently inflicted injury is less than fatal and that it would be anomalous to do otherwise.[24] However, as the dissent in *Berger* explained, the rationale for allowing such damages in a wrongful death context is based on historical and policy considerations that are not applicable to negligence claims involving a less grievous injury:

---

[23] Justice ARCHER suggests, without explanation, that this " 'slippery slope' argument has never been less applicable than in relation to this cause of action" (*post*, p 306, n 4). We fail to see the logic of such reasoning and firmly believe that a sibling, grandparent, or others with close emotional ties to a negligently injured plaintiff may share the same intangible interests to the same degree as the parent. Indeed, the dissent itself seems to already be slipping further down the slope of consortium liability by implying that siblings should also be entitled to maintain a separate consortium action. ("There is a clear qualitative distinction between the nuclear family and all other interpersonal relationships." *Post*, p 306, n 4.)

Furthermore, we similarly do not fear that lower courts will *"inadvertently"* be led to recognize additional consortium actions if we recognize the parent's claim (see *id.*). However, they may indeed be inclined to do so by employing the same reasoning posited by the dissent in support of its position in this matter.

[24] Under Michigan's wrongful death act, MCL 600.2922; MSA 27A.2922, parents may recover for the loss of society and companionship of their child when the child dies as the result of negligent injury.

Whether or not it was an accurate historical statement, Lord Ellenborough's famous dictum that "[i]n a civil court, the death of a human being could not be complained of as an injury" was accepted as declaratory of the common law. The harshness of this rule and its apparent incentive to inflict death rather than injury inspired legislatures to create statutory remedies for "the most grievous of all injuries." Allowing recovery for the lost affection and society of a fatally injured person assures that a meaningful remedy will be available in every case without regard to whether that person was a wage earner or contributed to the support of the spouse, parent or child in whose interest the action is maintained. "Recovery for loss of affection and society in a wrongful death action thus fulfills a deeply felt social belief that a tortfeasor who negligently kills someone should not escape liability completely, no matter how unproductive his victim."

But where the parent injured by the tortfeasor's conduct survives, so does the parent's cause of action for the injuries inflicted. If the primary victim of the accident may bring an action, there is no need to permit other family members to recover in order to provide some compensation for the family and to prevent the tortfeasor from escaping liability altogether.

Further, where the parent survives the injury, certain aspects of the child's loss, e.g., impairment of the parent's ability properly to care and provide for his children, can be compensated in the parent's own action. But where the parent dies, compensation for loss of parental care and services can be recovered only through a wrongful death action. Whether or not this compensation encompasses recovery for the child's loss of society and companionship in addition to more pecuniary items such as lost wages from which support would have been furnished, the availability of some reparation for disadvantage to the child and to the victim's family furnishes a sufficient basis

for allowing the child to recover for lost society and companionship in the case of a parent's death but not in the case of parental injury. [*Berger, supra* at 47-48 (dissent by LEVIN, J.). See also *Borer v American Airlines, Inc, supra* at 451.]

Although the above comments were made when the question presented concerned recognition of the child's consortium claim, the reasoning is equally applicable to the question presented here.

We also note that other jurisdictions are evenly split in terms of recognizing the parent's consortium action as a matter of common law since Wisconsin became the first jurisdiction to do so in *Schockley, supra.*[25] However, we find it significant that among those jurisdictions which have declined to recognize the parent's action since *Schockley,* all have based their decisions on the same or similar policy considerations which impel us to the result we reach in this case.[26]

---

[25] In addition to Wisconsin, the following jurisdictions also recognize the parent's consortium action as a matter of common law. *Dralle v Ruder,* 148 Ill App 3d 961; 500 NE2d 514 (1986); *Norvell v Cuyahoga Co Hosp,* 11 Ohio App 3d 70; 463 NE2d 111 (1983); *Reben v Ely,* 146 Ariz 309; 705 P2d 1360 (1985).

Three jurisdictions also allow the parent to recover consortium damages for negligent injury to the child by statute. See Idaho Code 5-310 (interpreted in *Hayward v Yost,* 72 Idaho 415; 242 P2d 971 [1952] to include loss of protection, comfort, society, and companionship), Iowa Code Ann, Rules of Civil Procedure 8, and Wash Rev Code Ann 4.24.010.

The following jurisdictions have declined, since *Schockley,* to recognize the parent's action. See *Baxter v Superior Court of Los Angeles,* 19 Cal 3d 461; 138 Cal Rptr 315; 563 P2d 871 (1977); *Wilson v Galt,* 100 NM 227; 668 P2d 1104 (1983); *Siciliano v Capitol City Shows, Inc,* n 18 *supra.*

[26] Justice ARCHER criticizes our reliance on the pertinent policy considerations in reaching our result because they are "relevant to *every* cause of action in tort." (*Post,* p 307, n 5.) Whether or not this is so, what makes them particularly relevant to this cause of action is that these considerations loom larger when we must determine whether to impose *additional* levels of liability on a negligent tortfeasor and the incremental effect on these considerations as they relate to the tort system of recovery.

IV

It is clear to us that further extension of a negligent tortfeasor's liability involves a variety of complex social policy considerations.[27] In light of these concerns, we believe that the determination of whether this state should further extend a negligent tortfeasor's liability for consortium damages should be deferred to legislative action rather than being resolved by judicial fiat. Therefore, we reverse the decision of the Court of Appeals.

Levin, Brickley, Cavanagh, and Griffin, JJ., concurred with Riley, C.J.

Griffin, J. I concur. However, I am compelled to observe that the logic and policies which support the Court's decision in this instance are equally applicable in the case of a child's claim for loss of parental society and companionship. For the reasons set forth by the Chief Justice in this case and by Justice Levin in his dissent in *Berger v Weber,* 411 Mich 1, 18-49; 303 NW2d 424 (1981), I would go a step further today and indicate that the inconsistent holding laid down by the four to three vote of this Court in *Berger* will no longer be regarded as precedent.

Archer, J. (*dissenting*). We are asked to determine whether the Court of Appeals recognition of a parent's cause of action for the loss of filial society and companionship was a proper extension

---

[27] In her dissent, Justice Boyle concludes that "[t]he majority opinion amounts to a statement that if damage to the family cannot be measured in dollars, it should not be recognized." However, the difficulty inherent in assessing damages incurred from injury to the intangible interests at stake is but one of the various economic considerations which leads us to conclude that the decision to recognize a parental consortium action is more appropriately left to the Legislature.

of this Court's holding in *Berger v Weber,* 411
Mich 1; 303 NW2d 424 (1981). In *Berger,* this
Court recognized a cause of action in favor of a
child for the loss of parental society and compan-
ionship.

There are three alternatives for this Court in
disposing of this matter. First, the Court could
affirm the holding of the Court of Appeals that the
reasoning in *Berger* supports a reciprocal cause of
action in favor of parents for the loss of filial
society and companionship. Second, the Court
could distinguish between the rights of a child to
parental consortium and those of a parent to filial
consortium. Third, this Court could overrule *Ber-
ger* and eliminate the common-law cause of action
in favor of a child for the loss of parental society
and companionship.

Because the reasoning of the Court in *Berger* is
logical and is based on valid policy considerations,
the doctrine of stare decisis requires this Court to
adhere to *Berger* as binding precedent. The plain-
tiff's cause of action in this case is different from
that recognized in *Berger;* it is reciprocal. There
are, however, no principled distinctions discernible
regarding the injury to be redressed in the instant
claim when it is compared with the cause of action
in *Berger.* Therefore, I would affirm the decision of
the Court of Appeals.[1]

I

FACTS

On October 28, 1981, an automobile driven by

---

[1] The majority, at p 291, ns 15 and 16, misconstrues this argument
regarding *Berger.* I do not suggest that *Berger* directly binds this
Court in the instant case. The argument is that *Berger* is good law;
its reasoning and policy considerations, when applied to the question
presented here, are applicable and valid. Therefore, although there is
no direct constraint imposed by stare decisis, the only logical outcomes
are those listed in the immediately preceding paragraph. This ar-
gument is more fully developed in part III.

the defendant, Bruce Smock, struck fifteen-year-old Valera Sizemore as she was riding her bicycle. Ms. Sizemore suffered a concussion, various abrasions, and hematomas in her left eye and calf. She has also alleged that she sustained severe kidney injuries, including the permanent atrophy of one of her kidneys and injury to the other requiring lifetime medication and the potential of dialysis in the future.

Valera Sizemore filed suit in Genesee Circuit Court against defendants Bruce Smock and Pete Alumbaugh, Inc., the owner of the vehicle Smock was driving. In addition to Valera Sizemore's claim, the complaint contained a cause of action on behalf of Veda K. Sizemore, Valera's mother, for the "loss of the companionship, society and protection of her daughter as well as the necessity to care for her daughter's physical needs, and to provide medical care and treatment for her and parental concern regarding the serious injuries her daughter sustained."

The defendants moved for summary disposition pursuant to GCR 1963, 117.2(1) (now MCR 2.116[C][8]) against Veda Sizemore. They argued that Michigan law does not recognize a parent's claim for loss of society and companionship when a child is negligently injured. The trial court granted defendants' motion and also determined that Veda Sizemore did not have a cause of action for meeting her child's medical needs because she is already compensated for these expenses through the no-fault insurance act.

Plaintiff appealed as of right in the Court of Appeals. The Court reversed the judgment of the trial court, finding that under Michigan law a parent can maintain a cause of action for loss of

the society and companionship of a negligently injured child. The Court agreed with the defendant, however, that the parent's cause of action did not include medical expenses. It held that the exclusive remedy for her daughter's medical expenses is through the no-fault insurance act.

The Court of Appeals relied on this Court's decision in *Berger, supra.* It held that there was no reason that the instant claim should not be reciprocal to that recognized in *Berger.*[2]

The defendant appealed in this Court. We granted leave to appeal, limited to the question whether the common law of the State of Michigan should recognize a cause of action on behalf of a parent for loss of the companionship and society of a child negligently injured by a tortfeasor.[3]

II

The *Berger* decision extended the common-law cause of action for loss of consortium to include a child's claim for the loss of parental society and companionship. In *Berger,* the defendant argued that the absence of a sexual relationship between parent and child precluded a child's claim for loss of parental consortium. This Court found the distinction to be unpersuasive.

> Sexual relations are but one element of the spouse's consortium action. The other elements— love, companionship, affection, society, comfort, services and solace—are similar in both relationships and in each are deserving of protection. [*Berger, supra* at 14.]

The significant factors common to the spousal

---

[2] *Sizemore v Smock,* 155 Mich App 745, 746-747; 400 NW2d 706 (1986).

[3] *Sizemore v Smock,* 428 Mich 873 (1987).

consortium action and the cause of action recognized in *Berger* are unquestionably present in the cause of action involved in the instant appeal. In fact, an examination of the reasoning in *Berger* yields the inescapable conclusion that the instant claim was impliedly recognized in that decision.

The rationale in *Berger* drew heavily from the reasoning of *Schockley v Prier,* 66 Wis 2d 394; 225 NW2d 495 (1975). In *Schockley,* the parents of a minor child brought suit against two doctors and their insurer for injuries sustained by the child. The injuries were allegedly caused by the doctors' negligence. In addition to the cause of action in favor of the child, the parents also requested damages for loss by the parents of the child's aid, comfort, society, and companionship as a result of the negligently caused injury. The appeal in *Schockley* was limited to the issue whether a parent should be permitted to recover damages for the loss of aid, comfort, society, and companionship of a minor child who has been injured by the negligent acts of another.

The *Schockley* court first dealt with the issue whether the question at issue was best left to legislative resolution. The court declined to shirk its judicial responsibility. It stated that "it is as much our responsibility, as the legislature's, to make changes in the law, if the common-law rule no longer fits the social realities of the present day." *Id.* at 397. The court noted the garbled and illogical evolution of the common law regarding damages for consortium. It relied in part on *Montgomery v Stephan,* 359 Mich 33; 101 NW2d 227 (1960), in which this Court decried the irrational history of consortium damages and created a cause of action for the loss of spousal consortium.

The *Schockley* court noted that children are no longer merely economic assets. The court recog-

nized that the relationship between parent and child in present society primarily involves emotional ties rather than economic benefit to the parent. It concluded that its judicial responsibility to adapt the common law to fit current social realities required recognition of the right of parents to recover for loss of aid, comfort, society and companionship of a child negligently injured by a third party. *Schockley v Prier, supra* at 398-399.

This Court has also rejected the archaic notions of familial relationships which have caused the common law to evaluate these relationships in terms of pecuniary interests alone. In *Wycko v Gnodtke,* 361 Mich 331, 336-337; 105 NW2d 118 (1960), this Court stated:

> It is not surprising that the courts of such a society should have read into [the measure of damages] not only the requirement of a pecuniary loss, but, moreover, a pecuniary loss established by a wage benefit-less-costs measure of damages. . . . Loss meant only money loss, and money loss from the death of a child meant only his lost wages. All else was imaginary. *The only reality was the king's shilling.*
> *That this barbarous concept of the pecuniary loss to a parent from the death of his child should control our decisions today is a reproach to justice.* [Emphasis added.]

The *Wycko* Court went on to hold that damages under Michigan's wrongful death act for the death of a minor child were not limited to purely economic damages consisting of probable wages less the cost of the upkeep or maintenance of the child. The damage remedies available included compensation for loss of the society and companionship of the child. *Id.*

One of the policy considerations relied on in

*Berger, supra* at 13, was a reflection in this state's wrongful death act, MCL 600.2922; MSA 27A.2922, that consortium damages should be available to parents and children alike. Other courts have also found that recognition of filial consortium damages in wrongful death legislation requires similar recognition in the common law of negligence. In *Dralle v Ruder,* 148 Ill App 3d 961; 500 NE2d 514 (1986), the Illinois Court of Appeals analogized to that state's wrongful death statute and its inclusion of damages for a parent's loss of the society of a minor child to hold that a parent had a similar cause of action for a loss of society and companionship resulting from a nonfatal injury to their minor child. *Id.* at 962. The court dismissed arguments about the intangible nature of the parent's loss and the difficulty in assessing damages in this type of action. *Id.* at 963. The court found that failure to recognize this cause of action, given the damages included under the wrongful death statute, would create a legal anomaly. *Id.* The Ohio Court of Appeals, with similar reasoning, has held that because its wrongful death statute compensates for loss of consortium its tort law regarding negligently caused injuries to a minor child should also include a damage remedy for loss of consortium. *Norvell v Cuyahoga Co Hosp,* 11 Ohio App 3d 70; 463 NE2d 111 (1983).

*Berger* represents a triumphant effort by this Court to recognize the present status of familial relationships and to adapt the common law to reflect this recognition. This is the unique province of the judiciary. Such efforts, when based on valid and logical policy considerations, are to be accorded deference in the deliberations of subsequent panels of this Court. *Abendschein v Farrell,* 382 Mich 510; 170 NW2d 137 (1969); *Parker v Port Huron Hosp,* 361 Mich 1; 105 NW2d 1 (1960).

III

This case presents a very difficult policy question. This Court is not, however, without guidance in its attempt to evaluate and balance the relevant competing policy considerations.

The common-law action for loss of consortium has changed dramatically from its origins as a means of redress for a husband or father for a third-party's intentional interference with the services of the wife or child. As the action evolved to become a part of the law of negligence, it became unnecessary to show actual economic loss in order for a plaintiff to recover for loss of consortium. In *Montgomery, supra,* this Court repudiated the doctrine that allowed recovery only to the husband or father and held that the wife had a reciprocal right to recovery for loss of consortium in the spousal relationship.

Today's majority has drawn a line that distinguishes between the cause of action for loss of the consortium of a parent in favor of a minor child and an action in favor of a parent for loss of the consortium of a minor child. I submit that there are substantially better points along the continuum at which to draw a line delimiting the liability of the negligent tortfeasor.[4] The majority acknowledges that "any attempt to draw a meaningful distinction on the basis of the sentimental

[4] The majority notes that I do not attempt to suggest the final point of delimitation. I would not presume to do so on the briefs and record before us in this case. For the reasons stated in parts II and III of this dissenting opinion, I can unequivocally state that the instant cause of action is one that should be included in our common law regarding negligent injury and the resultant loss of society and companionship.

Also, the "slippery slope" argument has never been less applicable than in relation to this cause of action. There is a clear qualitative distinction between the nuclear family and all other interpersonal relationships. There is no danger that lower courts will *inadvertently* be led to recognize a loss of consortium cause of action for cousins or nephews on the basis of this case.

aspects of the consortium claim between the parties in the parent-child relationship would be specious and unavoidably futile." *Ante,* p 292. I agree. The majority fails, however, to draw a meaningful distinction on any other basis between the cause of action recognized in *Berger* and that involved in the instant appeal.

The majority justifies its departure from reason, logic and stare decisis by stating that "it must look beyond logical analogies and balance the arguments in support of recognizing a new cause of action against public policy considerations and the social consequences of imposing yet another level of liability." *Ante,* p 292. For example, the majority argues that "the burden of payment for additional consortium awards will be borne by the general public through the assessment of increased insurance premiums . . . ." *Ante,* p 295. All tort causes of action increase insurance costs, but we recognize them because we believe that certain injuries must be redressed in order to promote social stability and social responsibility. Surely the loss of the consortium of one's child is devastating and should be recognized. Similarly, all tort injuries are compensated with money judgments; no one suggests that these damages "replace" what has been lost. That is why we refer to them as compensatory. The remedy is imperfect; however, it is more effective at placing the loss on the party at fault than no remedy at all.

The majority does not introduce any new public policy considerations to justify a departure from the reasoning of *Berger.*[5] As previously noted, *Berger* drew heavily from *Schockley.* The cause of

[5] The majority's reasoning is essentially the same as that used against recognition of any cause of action. It is not that these considerations are irrelevant to the recognition of this cause of action, but that they are relevant to *every* cause of action in tort. Thus, the salient question is what makes them *particularly* relevant to this

action recognized in *Schockley* was precisely the
cause of action involved in the instant appeal. If
that cause of action is to be dispensed with, and
the underlying policy considerations are to be
dismissed, then this Court must do more than
merely "independently reexamine the various ar-
guments and policy considerations which closely
divided the Court in both *Berger* and *Montgom-
ery." Ante,* p 290. If for no other reason, the
principle of stare decisis requires more.

### CONCLUSION

The reasoning in *Berger* allows for no principled
distinction between the child's cause of action for
loss of parental consortium and the parental ac-
tion for loss of filial consortium. Thus, the Court of
Appeals was reasonable and logical in its holding
in the instant matter. For this reason, I would
affirm the decision of the Court of Appeals,
thereby creating a cause of action in Michigan on
behalf of a parent for a negligent injury to a child
that results in loss of consortium.

BOYLE, J. (*dissenting*). I concur in Justice ARCHER's
conclusion that a parent may maintain a cause
of action for loss of filial society and companion-
ship when a child is severely injured. I write
separately to express my view as to why this
action is appropriate.

First, I acknowledge that there is an inherent
contradiction in recognizing the intangible aspects
of a relationship and assigning a monetary value
to its loss or interference. Any judge who has
assessed damages as a factfinder or instructed a
jury that "[t]he law leaves such amount to your

cause of action. I would suggest that the majority has failed to
establish the more salient point.

sound judgment," SJI2d 50.01, cannot fail to appreciate the difficulty of the task or the incongruity of assigning a dollar value to that which cannot be evaluated in a precise dollar amount.

The ultimate issue for this Court is not whether the remedy is difficult to apply or whether it fully redresses the wrong so as to maximize deterrence. Rather, the question for the Court is how the legal system as an institution that represents, inculcates, and transmits social values to future generations should regard the interest seeking protection.

When a cause of action in tort is recognized, society stands with the victim, acknowledges the importance of the value that allegedly has been damaged, and fixes the responsibility of the tortfeasor.[1] Thus, the law of torts is no more the mere adjustment of losses by the exchange of money damages than the criminal law is the taking of an eye for an eye or a tooth for a tooth. Certainly money damage is the principal tort remedy, just as punishment is the sanction for criminal behavior. But money damage is no more the purpose of tort

---

[1] As explained by one commentator:

    One factor affecting the development of tort law is the moral aspect of the defendant's conduct—the moral guilt or blame to be attached in the eyes of society to the defendant's acts, motives, and state of mind. Personal morals are of course a matter on which there may be differences of opinion; but in every community there are certain acts and motives which are generally regarded as morally right, and others which are considered morally wrong. Of course such public opinion has its effect upon the decisions of the courts. The oppressor, the perpetrator of outrage, the knave, the liar, the scandal-monger, the person who does spiteful harm for its own sake, the selfish aggressor who deliberately disregards and overrides the interests of neighbors, may expect to find that the courts of society, no less than the opinion of society itself, condemn the conduct. In a very vague general way, the law of torts reflects current ideas of morality, and when such ideas have changed, the law has tended to keep pace with them. [Prosser & Keeton, Torts (5th ed), § 4, p 21.]

law than punishment is the purpose of criminal law. The penalties are the imprecise analogies by which the law measures responsibility. The right recognized is the means by which society transmits the judgment that the value involved is worthy of protection.

Recognizing both the frailty of law to provide perfect redress and the power of laws to communicate societal values, we inquire first whether this society accords a unique value to the relationship of parent and child, and second what responsibility an individual bears for injuries to the child of another.

The first question is easily answered.

> At stake here is "the interest of a parent in the companionship, care, custody, and management of his or her children." *Stanley v Illinois,* 405 US 645, 651 [92 S Ct 1208; 31 L Ed 2d 551] (1972). This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. "[F]ar more precious . . . than property rights," *May v Anderson,* 345 US 528, 533 [73 S Ct 840; 97 L Ed 1221] (1953), parental rights have been deemed to be among those "essential to the orderly pursuit of happiness by free men," *Meyer v Nebraska,* 262 US 390, 399 [43 S Ct 625; 67 L Ed 1042; 29 ALR 1446] (1923), and to be more significant and priceless than " 'liberties which derive merely from shifting economic arrangements.' " *Stanley v Illinois,* 405 US, at 651, quoting *Kovacs v Cooper,* 336 US 77, 95 [69 S Ct 448; 93 L Ed 513; 10 ALR2d 608] (1949) (Frankfurter, J., concurring). [*Lassiter v Dep't of Social Services,* 452 US 18, 38; 101 S Ct 2153; 68 L Ed 2d 640 (1981) (Blackmun, J., dissenting).][2]

---

[2] Although the *Lassiter* majority refused to recognize the right to counsel at hearings on termination of parental rights, Michigan does recognize the right and requires the appointment of counsel for parents on their request. MCR 5.915(B)(1).

Our commitment as a society to the value of the familial relationship is embodied in the Probate Code's due process protections against interference, and its preference for maintenance of the family unit until established risk to the child requires separation or dissolution.[3] Thus, the American view of the value of the family has been consistently more encompassing than the value of the labor lost from injury to the child of a farmer in the agrarian United States. The underlying moral message of the legal system recognizes a unique dimension to the parent-child relationship, reflected existentially by the fact that the most traumatic event in modern day life is the death of a child.[4]

The continued life, health, and productivity of children are unquestionably paramount concerns of responsible parents. Unlike that of any other family member, a child's life is the parents' tangible claim to immortality, the connection to future generations, and the wellspring for parental instruction, parental sacrifice, and parental love.

Whatever cynicism exists today regarding lawyers or frivolous lawsuits, we are required here to steadfastly focus on the existence of real victims, well-founded lawsuits, and negligent third parties. We are required, in short, to suspend all cynicism and face only the question whether a parent whose child must remain on a dialysis machine for the

[3] Under the Juvenile Code, for instance, the jurisdiction of the probate court may be exercised to take temporary jurisdiction on the basis of only a preponderance of the evidence. A termination of parental rights, on the other hand, requires clear and convincing evidence of one of the statutory grounds. MCR 5.972(C), MCR 5.974(D)(2).

[4] The death of a child is the most stressful event of 102 common life events. By comparison, the death of a spouse ranked second, and assault, long recognized as a cause of action, ranked fifty-second. Goldberger & Breznitz, *Handbook of Stress* (New York: The Free Press, 1982), p 342.

rest of her life has suffered a loss that society recognizes.

I assume we would all agree that there is real damage to the familial unit in these circumstances.[5]

I disagree with the majority that the inability to draw a point of demarcation in a future case should preclude recognition of this claim. In the context of this lawsuit, we either recognize the intangible value of the immediate family unit, or we do not; in the context of our tort system, we recognize that the remedy for interference with this value is either damages or nothing.

I would not defer recognition of this claim to the Legislature. The Legislature may choose to limit damages, to require more exacting proofs, or to limit the period of limitations. It is a rare instance, however, in which the Legislature has recognized a cause of action we have declined to recognize.[6]

I share the majority's concern for the economic burdens and social consequences resulting from an extension of tort liability.[7] In the context of these

_____

[5] Concern for duplicative recovery perhaps could be addressed by recognizing that it is the nature of the relationship within the unit as a unit that is altered by the injury to one of its immediate members, and that there can be only one recovery for what is an indivisible injury.

[6] Indeed, in many instances the Legislature has created only administrative mechanisms, but relied upon this Court to exercise its leadership in establishing a civil cause of action. See, e.g., *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 (1971).

[7] The protection against accidental injury provided by the insurance industry has, in practice, produced a spreading of risk that results in those without fault subsidizing damages done by those at fault. This result is not consistent with the traditional tort notion that responsibility follows fault. I am unwilling to conclude, however, that this grievance, however legitimate, will cause responsible citizens to go uninsured, or that the need to address increased insurance premiums or increased litigation outweighs this Court's responsibility to affirm the value of the family unit. The tort law "crisis" may, in some instances, be overstated, but no thoughtful citizen is unaware that

allegations, I do not accept the majority's solution. I view this case and this issue, resting as it does upon presumed fault, as well within the traditional, common-law function of the Court.

The majority opinion amounts to a statement that if damage to the family cannot be measured in dollars, it should not be recognized. The majority has thus equated dollars with values and has concluded that because damages cannot be precisely measured, the courts ought not recognize the underlying value. I respectfully dissent.

there are extremely serious problems in our current system of reparations. In dissenting, I do not suggest that courts should be blind to these realities; I insist only that courts must take particular care that our common-law role as shapers and reflectors of societal values is not overcome by a significant difficulty of the moment.