MAY v WILLIAM BEAUMONT HOSPITAL

Docket No. 93511. Submitted December 21, 1988, at Detroit. Decided November 6, 1989.

Alan A. May, conservator of the estate of Robert Kolosowski, a minor, Stanley Kolosowski, and Jadwiga Kolosowski, individually and as next friend of Robert Kolosowski, brought an action in the Oakland Circuit Court against William Beaumont Hospital and Christopher Marlowe, alleging malpractice in the prenatal treatment of Jadwiga Kolosowski resulting in injuries to the infant, Robert Kolosowski. The jury returned a verdict in favor of the infant in the amount of $5,000,000, in favor of Mrs. Kolosowski in the amount of $1,500,000, and in favor of Mr. Kolosowski in the amount of $500,000, and found Dr. Marlowe seventy percent responsible and the hospital thirty percent responsible for Robert Kolosowski's injuries. The court, Alice L. Gilbert, J., granted a judgment notwithstanding the verdict on the claims of Mr. and Mrs. Kolosowski and remitted the verdict of $5,000,000 to $106,696.01. Plaintiffs appealed and Dr. Marlowe cross appealed.

The Court of Appeals *held:*

1. The court did not err in granting a judgment notwithstanding the verdict on Mr. and Mrs. Kolosowski's claims. A parent has no action for the loss of a child's society and companionship. While there is a cause of action for a parent's emotional distress sustained after witnessing a child's injury, such an action requires proof of physical harm to the parent and plaintiffs presented no proof of physical harm to themselves. Last, plaintiffs' theory that Mrs. Kolosowski was an

REFERENCES

Am Jur 2d, Appeal and Error §§ 110, 112, 939, 969; Damages §§ 945, 969-975, 1006-1008, 1021-1025; Evidence § 268; Fright, Shock, and Mental Disturbance §§ 13 *et seq.*, 36; Judgments §§ 106 *et seq.*; Parent and Child §§ 97-99; Physicians, Surgeons, and Other Healers §§ 200 *et seq.*; Summary Judgment §§ 6, 17, 27.

See the Index to Annotations under Additur and Remittitur; Appeal and Error; Children; Consortium; Emotional Injury; Judgment Notwithstanding Verdict; Malpractice by Medical or Health Professions; Summary Judgment.

independent victim of malpractice fails for lack of evidence of physical injury to her.

2. The court erred in granting remittitur from $5,000,000 to $106,696.01. First, the court should have reduced the jury's award of future damages to its present value, the court having failed to instruct the jury to make that calculation. The court further erred in determining future lost wages based on a salary of $3.35 an hour for life where the evidence indicated that, had he not been injured, Robert could have been employed at $14.80 per hour. Further, the court erred in reducing future lost wages by the amount of income taxes payable on the income. The court also erred in its assessment of the evidence of noneconomic damages. Thus, while remittitur was appropriate, the court abused its discretion in reducing the award to $106,696.01.

3. The evidence will support an award of $315,843.84 for Robert's future economic losses and $950,000 for past and future noneconomic losses.

4. There was no error requiring reversal in plaintiffs' experts' testimony.

5. The arguments of plaintiffs' counsel were not improper.

6. The court did not err in denying defendant Dr. Marlowe's motions for a directed verdict and a judgment notwithstanding the verdict.

7. The court did not abuse its discretion in giving plaintiffs' requested jury instruction on mental anguish.

Affirmed in part, reversed in part and remanded with instructions.

CYNAR, J., concurred in all respects but the determination of damages. He would hold that the evidence supported a judgment of $1,800,000, the present value of the $5,000,000 jury verdict.

1. MOTIONS AND ORDERS — DIRECTED VERDICT.

In deciding whether or not to grant a motion for a directed verdict, the trial judge must accord to the nonmoving party the benefit of viewing the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the nonmoving party; if the evidence, when viewed in this manner, establishes a prima facie case, the motion for a directed verdict must be denied.

2. NEGLIGENCE — PARENT AND CHILD — LOSS OF CONSORTIUM.

A claim by a parent for the loss of a child's society and companionship where the child has been negligently injured is not recognized under the common law of Michigan.

3. MOTIONS AND ORDERS — JUDGMENT NOTWITHSTANDING THE VER-
   DICT.

   The grant of a defendant's motion for a judgment notwithstand-
   ing the verdict is appropriate only if the evidence is insufficient
   as a matter of law to support a judgment for the plaintiff; in
   reaching a decision, the trial court must view the evidence in
   the light most favorable to the plaintiff and give the plaintiff
   the benefit of every reasonable inference that could be drawn
   from the evidence; if, after viewing the evidence in this man-
   ner, reasonable men could differ, the question is one for the
   jury and judgment notwithstanding the verdict is improper.

4. TORTS — EMOTIONAL DISTRESS — PARENT AND CHILD.

   A parent who witnesses the negligent infliction of injury to his
   child and suffers emotional and mental distress as a conse-
   quence may have a cause of action based on negligence pro-
   vided that: (1) the injury threatened or inflicted was serious
   and of a nature such that severe mental disturbance to the
   parent would have reasonably been foreseen to follow; (2) the
   shock resulted in actual physical harm; and (3) the parent was
   actually present at the time of the injury to the child or at
   least suffered shock fairly contemporaneous with the injury;
   the nature of the injury must be examined on a case-by-case
   basis in order to determine whether it was foreseeable that
   emotional and mental distress to the parent was likely to
   result.

5. DAMAGES — REMITTITUR — VERDICTS — COURT RULES.

   Remittitur is justified where the amount awarded is greater than
   the highest amount the evidence will support; in deciding
   whether the jury award is supported by the proofs, a trial court
   may also inquire whether the verdict was the result of im-
   proper methods, prejudice, passion, partiality, sympathy, cor-
   ruption, or mistake of law or fact, whether the verdict was
   within the limits of what reasonable minds would deem just
   compensation for the injury sustained, and whether the
   amount actually awarded is comparable to awards in similar
   cases within the state and other jurisdictions (MCR 2.611[E][1]).

6. APPEAL — REMITTITUR.

   In reviewing a trial court's grant or denial of remittitur, a
   reviewing court must afford due deference to the trial judge
   and may not substitute its judgment for that of the trial judge
   absent an abuse of discretion.

7. DAMAGES — FUTURE DAMAGES — PRESENT VALUE.

   An award of future damages must be reduced to present value

even in the absence of a request to do so; the trial court must instruct the jury on the reduction or must itself reduce the award to present value.

8. DAMAGES — LOST WAGES.
   The proper factor in determining lost wages is what the injured person could have earned but for the injury.

9. DAMAGES — LOST FUTURE WAGES — INCOME TAXES.
   In the absence of a statutory provision, courts must disregard income tax consequences in fixing damages for lost future earning capacity in personal injury cases.

10. DAMAGES — FUTURE DAMAGES — PRESENT VALUE — INFLATION — JURY INSTRUCTIONS.
    In reducing future damages to present value, the effects of inflation may be taken into account (SJI2d 53.06).

11. PHYSICIANS AND SURGEONS — MEDICAL MALPRACTICE.
    A treating physician is liable for damages when it is shown that he departed from the standard of care which is known as customary medical practice; the measuring standard of care is founded upon how other doctors in that field of medicine would act and not how any particular doctor would act.

12. EVIDENCE — WRITTEN OR RECORDED STATEMENTS — RULES OF EVIDENCE.
    When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it (MRE 106).

13. APPEAL — DIRECTED VERDICT — JUDGMENT NOTWITHSTANDING THE VERDICT.
    The standard of review applicable to a denial of a motion for a directed verdict or a motion for judgment notwithstanding the verdict is that review by the Court of Appeals is limited to whether the party opposing the motion offered evidence upon which reasonable minds could differ; the test is whether, viewing the facts in a light most favorable to the nonmoving party, reasonable persons could reach a different conclusion and, if so, the case is properly one for the jury; the nonmoving party must be given the benefits of every reasonable inference that can be drawn from the evidence.

*Charfoos & Christensen, P.C. (by David W.*

*Christensen*), and *Gromek, Bendure & Thomas* (by *Mark R. Bendure*), for plaintiff.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C.* (by *John P. Jacobs*), for Dr. Christopher Marlowe.

*Sullivan, Ward, Bone, Tyler, Fiott & Asher, P.C.* (by *Michelle A. Thomas*), for William Beaumont Hospital.

Before: MacKenzie, P.J., and Cynar and M. E. Kobza,* JJ.

MacKenzie, P.J. We agree with Judge Cynar's disposition of all claims raised on appeal, except the amount of remitted damages Robert Kolosowski should have been awarded.

As a general rule, awards for personal injury rest within the sound judgment of the trier of fact. If the amount awarded falls reasonably within the range of evidence and within the limits of what reasonable minds would deem just compensation for the injury sustained, the verdict should not be disturbed. *Precopio v Detroit,* 415 Mich 457; 330 NW2d 802 (1982). However, where a jury's award is greater than the highest amount the evidence will support, remittitur is proper. See *Palenkas v Beaumont Hospital,* 432 Mich 527; 443 NW2d 354 (1989). This Court may only disturb a grant of remittitur if an abuse of discretion is shown. *Palenkas, supra.*

In this case, the trial court remitted the jury's $5,000,000 award to $106,696.01. As Judge Cynar's opinion details, the trial court in reaching this remitted amount committed a number of legal and factual errors. While we are cognizant of our duty to afford due deference to the decision of the trial judge, *Palenkas, supra,* in light of these errors we conclude that the trial court abused its discretion

---

* Circuit judge, sitting on the Court of Appeals by assignment.

in its grant of remittitur. Based upon an objective review of the evidence, *Palenkas, supra,* we are of the opinion that the proofs reasonably support a remitted total award of $1,265,843.84.

As *Precopio, supra,* and Judge Cynar's opinion indicate, damages in personal injury cases may compensate the plaintiff for both economic losses (such as lost wages and expenses associated with the plaintiff's injury) and for noneconomic losses (including pain, disability, and lost enjoyment).

We agree with Judge Cynar's opinion that the remitted award for Robert Kolosowski's economic losses constituted an abuse of discretion. For the reasons stated in Judge Cynar's opinion, we are satisfied that the evidence in this case warranted an award to Robert Kolosowski of $315,843.84 for his future economic losses.

We also conclude that the trial court's remitted award to plaintiff for his noneconomic losses constituted an abuse of discretion. In assessing the appropriateness of an award for noneconomic losses, analogous cases provide a sense of a reasonable range of awards. *Precopio, supra,* pp 471-472. The awards in the analogous cases must be adjusted for the difference between purchasing power in the year of those judgments and the year of the judgment under consideration. *Precopio, supra,* p 474, n 26. The judgment in this case was rendered in 1985. Cases involving injuries analogous to those suffered by Robert Kolosowski demonstrate a range of awards from approximately $182,000 to approximately $1,111,500 in 1985 dollars.[1] Only where the brain damage sustained by the plaintiff

---

[1] To adjust analogous judgments to 1985 dollars, we have used the following formula based on the Consumer Price Index (CPI):

$$\frac{(\text{Average CPI 1985}) - (\text{Average CPI year of analogous judgment})}{\text{Average CPI year of analogous judgment}} \times 100$$

This formula yields the percentage by which the analogous judgment must be increased to reflect 1985 purchasing power.

resulted in profound retardation,[2] or was accompanied by disfigurement and emotional disorders,[3] have courts exceeded the above range.[4]

In *Sewar v Gagliardi Bros Service,* 69 AD2d 281; 418 NYS2d 704 (1979), a twelve-year-old struck by a bus suffered a fractured skull, brain damage, restricted sight and hearing, and some spasticity. The plaintiff's IQ was measured at between fifty-seven and sixty-three, and she was deemed educable to the third-grade level, with an extremely limited social and occupational future. Remitted damages were $750,000 (approximately $1,111,500 in 1985 dollars) for pain and suffering and permanent disability. The remittitur was affirmed.

In *Herman v Milwaukee Children's Hospital,* 121 Wisc 2d 531; 361 NW2d 297 (1984), a ten-year-old suffered a reduced IQ of eighty-five (dull normal range) as a result of medical malpractice. A jury awarded the plaintiff over $2,000,000 for past and future pain, suffering, and disability. On appeal, the award was reduced to $925,000 (approximately $958,300 in 1985 dollars), as that was the highest amount plaintiff's attorney requested the jury to award.

In *Coastal States Gas Producing Co v Locker,*

[2] See, e.g., *Tinnerholm v Parke-Davis & Co,* 411 F2d 48 (CA 2, 1969), and *Northern Trust Co v Cook County,* 135 Ill App 3d 329; 90 Ill Dec 157; 481 NE2d 957 (1985).

[3] See, e.g., *Frankel v United States,* 321 F Supp 1331 (ED Pa, 1970).

[4] Indeed, in instances where the plaintiff suffered profound retardation and could never master basic body functions or be trained in simple skills, courts have approved awards within the above range. See, e.g., *Davis v Royal-Globe Ins Cos,* 223 So 2d 912 (La App, 1969) (award of approximately $337,000 in 1985 dollars), *Schnebly v Baker,* 217 NW2d 708 (Ia, 1974) (award of approximately $654,300 in 1985 dollars), and *Shaw v United States,* 741 F2d 1202 (CA 9, 1984) (award of approximately $1,036,000 in 1985 dollars).

436 SW2d 592 (Tex Civ App, 1968), a five-year-old suffered permanent brain damage in an automobile accident. The boy was left with an IQ of seventy-eight and he exhibited behavioral problems. A jury awarded him $400,000 for mental impairment, anguish, and lost earning capacity. On appeal, the court determined that this award should have been remitted to $300,000 (approximately $927,600 in 1985 dollars), including an award for lost earning capacity.

In *Stanley v Ford Motor Co,* 49 AD2d 979; 374 NYS2d 370 (1975), the plaintiff suffered permanent brain damage impairing his physical and mental coordination. Evidence established that his educational ability was severely limited and future employment would be confined to menial tasks. Additionally, there was a likelihood the plaintiff would develop seizure and emotional disorders. An award of $315,000 (approximately $687,000 in 1985 dollars), which included the present value of lost future earnings, was upheld as not excessive.

In *Stanley v Wiley,* 325 So 2d 661 (La App, 1975), the thirteen-year-old plaintiff suffered head injuries in a truck accident, resulting in intellectual impairment to the dull-normal range, physical impairment of skilled movement, impaired judgment, and impaired memory. Noting that the plaintiff's changed appearance would diminish her social life and that her vocational prospects were poor, the court upheld a general award of $275,000 (approximately $550,000 in 1985 dollars).

In *Masters v Alexander,* 424 Pa 65; 225 A2d 905 (1967), a twelve-year-old child was awarded $100,000 (approximately $359,600 in 1985 dollars) for disfigurement, permanent lessening of earning capacity, physical and mental pain and discomfort, and personality change. His injuries included a fractured skull, eye damage, and permanent brain

damage leaving him unable to do or carry through anything but the most menial form of work. Additionally, the plaintiff sustained scarring of the face and head with a deformity and depression of the forehead.

In *Watts v Town of Homer,* 301 So 2d 729 (La App, 1974), a seventeen-month-old child was struck on the head with a metal pole, resulting in a fractured skull, swollen brain, and frequent convulsions. The child was unconscious for eight days, and holes had to be drilled in her skull. At the time of trial, left side paralysis was diminishing but affected her gait, her IQ was approximately fifty, and she was unable to attend school due to problems associated with convulsions. Because she required constant supervision and continual medication, she was deemed unable to work. The court remitted her general damages to $150,000 (approximately $327,000 in 1985 dollars).

Finally, in *Smolinski v Taulli,* 285 So 2d 577 (La App, 1973), a nineteen-month-old child fell, suffering a skull fracture. The child became hyperkinetic, exhibited slow motor development and slow toilet training, had difficulty with speech, and was in the dull or below normal intelligence range. A general award of $75,000 (approximately $182,000 in 1985 dollars) was held not excessive.

Based upon a review of the proofs and the above survey of analogous cases, we are persuaded that the highest award which can be justified for Robert Kolosowski's past and future noneconomic losses is $950,000. Plaintiff's neurological expert testified that Robert was mildly retarded. There is little likelihood that Robert will ever progress past the fourth grade level in school and his vocational opportunities will be limited. Children his age tease him, and he exhibits difficulties with speech. Robert will always require guidance and support,

and his chances of engaging in "normal" social interactions and relationships are significantly reduced. Nevertheless, although intellectually impaired, Robert is far from being profoundly retarded. At the time of trial, he was attending school, was fully ambulatory, played with younger children, rode a tricycle, and enjoyed watching television and going places with his mother. There was no evidence of seizure disorders, hearing or visual problems, or disfigurement as in some of the analogous cases. Plaintiff's neurological expert found Robert's physical size and appearance, coordination, balance, posture, movement, and strength all totally normal. His physical pain and suffering seems to have been minimal, involving headaches approximately every three months which were controlled by baby aspirin. Plaintiff's neurological expert testified that Robert could live independently. Taking a view of Robert Kolosowski's loss most favorable to him, an award of $950,000 for noneconomic losses is both within the range of the proofs and the awards made in analogous cases.[5]

On the basis of the above analysis, we are of the opinion that the evidence in this case warranted a total award to Robert Kolosowski of $1,265,843.84, plus statutory interest, for his economic and noneconomic losses. Because the trial court abused its discretion in remitting the verdict to $106,696.01, we vacate the judgment of the trial court and order the judgment remitted to $1,265,843.84 plus statutory interest. Plaintiff will have twenty-eight days from the date of this opinion to file an acceptance of this judgment with the trial court.

[5] Under the analysis suggested by *Precopio,* no further calculation reducing plaintiff's future noneconomic losses to present value is required, the assumption apparently being that the triers of fact in the analogous cases already did so.

Otherwise, this matter will be reversed for a new trial limited to the issue of damages.

Affirmed in part, reversed in part and remanded. We do not retain jurisdiction.

M.E. KOBZA, J., concurred.

CYNAR, J. *(part concurring and part dissenting opinion).* In this medical malpractice case, plaintiffs appeal by leave granted from the trial court's order of remittitur of the jury verdict for plaintiff Robert Kolosowski from $5,000,000 to $106,696.01. Plaintiffs further appeal the trial court's granting of a judgment notwithstanding the verdict on the claims of plaintiffs Jadwiga and Stanley Kolosowski. Defendant Christopher Marlowe cross appeals and raises several additional issues.

Plaintiffs filed suit against defendant William Beaumont Hospital on October 7, 1981, alleging negligence in the monitoring of Mrs. Kolosowski's labor which resulted in injuries to her child, Robert Kolosowski. Defendant hospital filed a counterclaim alleging that Mrs. Kolosowski had been negligent during her labor. On March 14, 1983, plaintiffs made a motion to amend their complaint to add defendant Marlowe as a party. The motion was granted on March 23, 1983.

Plaintiff Jadwiga Kolosowski is a Polish immigrant. After arriving from Poland in 1978, she met and married Stanley Kolosowski. Mrs. Kolosowski became pregnant sometime around February, 1979. In August 1979, Mrs. Kolosowski came under the care of Dr. Christopher Marlowe, M.D., an obstetrician and gynecologist. Because Mrs. Kolosowski did not speak English, she was taken to her doctor's appointments by her friend and interpreter, Halina Sobel. Defendant Marlowe testified at trial that Mrs. Kolosowski had been a good and

responsive patient when she came for her appointments. Likewise, Mrs. Kolosowski's interpreter, Mrs. Sobel, had been cooperative.

Mrs. Kolosowski was informed by Dr. Marlowe that the approximate due date of her child was December 25, 1979. Dr. Marlowe had calculated this date on the basis of the date of Mrs. Kolosowski's last period and the size of her uterus. An ultrasound test was not performed. Dr. Marlowe testified that an estimated due date of December 25, 1979, would be consistent with Mrs. Kolosowski's having had her last period on March 20, 1979. Dr. Marlowe acknowledged that his office records listed the date of Mrs. Kolosowski's last period as February 7, 1979, but indicated that the date had been written by his office staff and not by him. Dr. Marlowe also acknowledged that the certificate of live birth for Mrs. Kolosowski's baby, and the confidential information sheet, listed her last period as February 1, 1979. Dr. Marlowe further testified that the estimated date of birth for a woman whose last period was February 1, 1979, would be November 8, 1979.

On November 13, 1979, at approximately 9:30 P.M., Mrs. Kolosowski's water broke. Halina Sobel, who had been designated as Mrs. Kolosowski's interpreter and support person for the delivery, phoned Dr. Marlowe. Mrs. Sobel and Mrs. Kolosowski immediately left for defendant hospital. Mrs. Kolosowski testified that she had pains while she was in the car on the way to the hospital.

Dr. Marlowe testified that Mrs. Sobel never called him. Rather, Dr. Bankhead, an intern at defendant hospital, called and advised him that Mrs. Kolosowski was at the hospital. Dr. Bankhead told Dr. Marlowe that Mrs. Kolosowski's membrane had ruptured, that she was dilated to three centimeters, that she was one hundred percent

effaced, and that the baby's head had descended.
Dr. Marlowe testified that he believed it was a
premature rupture of the membrane and that the
birth would have to be induced. Dr. Marlowe told
Dr. Bankhead to do a prep and enema on Mrs.
Kolosowski, to get an x-ray, and to put her on an
external fetal heart monitor. An iv was also or-
dered. Dr. Marlowe testified that he arrived at the
hospital around 11:15 p.m.

Upon entering the hospital, Mrs. Kolosowski
was taken to an examination room and examined
by a doctor she did not know. Mrs. Kolosowski was
then taken to a room where a nurse explained
that she needed to be fully dilated before the baby
would come. The nurse stated that it could happen
within hours or not until morning. Mrs. Kolosow-
ski thought, however, that the nurse had said that
the baby would not be born until the morning.
Mrs. Kolosowski was then given an enema and
taken for an x-ray. Prior to that time, Mrs. Kolo-
sowski was having pains.

Thereafter, Mrs. Kolosowski was brought back
to her room by a nurse. Mrs. Kolosowski then
began to walk around the room. Mrs. Sobel re-
quested and received a cover from a nurse. Mrs.
Kolosowski put the cover on the floor and laid
down on it because she was in pain and the floor
was cool. Later, another nurse saw Mrs. Kolosow-
ski lying on the floor and took the cover away.
Mrs. Sobel testified that neither nurse told her to
tell Mrs. Kolosowski to get into bed. None of the
nurses assisted Mrs. Kolosowski into bed and she
was not put on an iv or on a fetal heart monitor.

Mrs. Kolosowski testified that Dr. Marlowe then
came into the room and Mrs. Sobel asked him for
pain medication for Mrs. Kolosowski. Dr. Marlowe
would not give her any pain medication and subse-
quently left the room. Mrs. Kolosowski then went

into the bathroom because she believed that she had to have a bowel movement. Dr. Marlowe came in to the room again while Mrs. Kolosowski was in the bathroom. He told Mrs. Sobel to tell Mrs. Kolosowski to come out of the bathroom because the baby could fall down onto the floor. It is unclear whether the statement about the baby falling onto the floor was ever communicated to Mrs. Kolosowski. Mrs. Kolosowski told Mrs. Sobel that she would be out when she was finished going to the bathroom. Dr. Marlowe then left the room. Both Mrs. Sobel and Mrs. Kolosowski testified that the bathroom door was open while Dr. Marlowe was in the room.

Mrs. Kolosowski then came out of the bathroom and began to scream in pain. At that point, there were no nurses or doctors in her room. Mrs. Kolosowski walked around the room screaming for approximately one-half hour. Mrs. Kolosowski, who was standing, then put her head on the bed and screamed that the baby was coming. Mrs. Sobel went to the hallway screaming for help. Before any medical personnel could get to the room, Mrs. Kolosowski's baby was born, dropping to the floor. Mrs. Kolosowski had given birth, at approximately 11:55 P.M., to a full-term baby boy, Robert Kolosowski. As a result of falling to the floor, Robert sustained a fractured skull.

Defendant Dr. Marlowe testified that he first saw Mrs. Kolosowski on November 13, 1979, when she was being brought back from the x-ray room and was wheeled past him at approximately 11:15 P.M. At approximately 11:20 P.M., Dr. Marlowe went to Mrs. Kolosowski's room. Before entering, he noticed that she was lying on the floor on a blanket. Without entering the room, Dr. Marlowe instructed some nurses to get Mrs. Kolosowski off the floor so that she could be checked. Dr. Mar-

lowe could not remember which nurses he told to help Mrs. Kolosowski. He observed several nurses helping her up off the floor. He then left the area.

Dr. Marlowe testified that, at approximately 11:30 P.M., he returned to Mrs. Kolosowski's room and found Mrs. Kolosowski in the bathroom with the door closed. Mrs. Sobel asked him if Ms. Kolosowski could have pain medication. Dr. Marlowe responded that she could not until she came out of the bathroom and he could find out what was going on. Dr. Marlowe could not be sure which nurses were in the room at the time but he knew that there were at least two of them present. Mrs. Kolosowski told Dr. Marlowe, through Mrs. Sobel, that she was having too much pain. Dr. Marlowe then asked the nurses and Mrs. Sobel to get her out of the bathroom and he left the room. Dr. Marlowe stated that Mrs. Kolosowski was having contractions at the time and that she was in labor.

Dr. Marlowe testified that, approximately ten minutes later, he came back to the room and Mrs. Kolosowski was still in the bathroom with several nurses present. Defendant Dr. Marlowe tried to get Mrs. Kolosowski out of the bathroom by talking to her through the door. Mrs. Kolosowski opened the bathroom door. She was seated on the toilet. Dr. Marlowe stood in the room for approximately ten to fifteen minutes asking her to come out of the bathroom. He also told her that if she did not come out she would deliver the baby into the toilet. Mrs. Sobel laughed at him and said "nobody is that stupid." At some point during the ten to fifteen minutes in which Dr. Marlowe was present, Mrs. Kolosowski shut the bathroom door. Dr. Marlowe testified that, at that point, he was fairly certain that Mrs. Kolosowski was in labor. However, he believed that he was not allowed to

go into the bathroom to assist her out because it would be an assault in the eyes of the law.

Dr. Marlowe left the room to see if he could find someone else to communicate with Mrs. Kolosowski. As he was walking down the hallway, a few minutes after he had left the room, he heard Mrs. Sobel screaming that the baby was coming. When he arrived at the room, another doctor was already present and had picked the baby up off the floor.

Nurse Geraldine Rupert testified that on November 13, 1979, she was working the 3:00 P.M. to 11:30 P.M. shift at the hospital. Nurse Rupert stated that the last time she saw Mrs. Kolosowski was at 10:40 P.M., when she sent her to x-ray. At 11:00 P.M., a shift change occurred in the nursing staff and she gave a twenty minute report to the nurses coming onto duty. Rupert testified that usually a mother's vital signs, blood pressure, contractions, and fetal heart tones are checked every half hour. All of these items had been checked at 9:30 P.M., but were not done at 10:00 P.M., 10:30 P.M., or at any time prior to Mrs. Kolosowski's going for x-rays. Nurse Rupert further testified that an external fetal heart monitor had not been applied to Mrs. Kolosowski at all due to the later problems with getting her into bed.

Nurse Pamela Masters testified that she administered the enema to Mrs. Kolosowski. When Mrs. Kolosowski was finished, Masters checked to see if she was in bed, which she was, and then sent her for x-rays. Prior to sending her for x-rays, Masters checked Mrs. Kolosowski visually to see if she was having contractions, which apparently she was not. Masters also testified that she probably checked for fetal heart tones at the time but did not chart it.

Nurse Diane Marquard testified that she worked

the 11:00 P.M. to 7:30 A.M. shift on the evening of November 13, 1979. She stated that she had been in Mrs. Kolosowski's room only once prior to the birth of the child. She could not remember what time she was in the room. When she entered the room, Dr. Marlowe, Mrs. Kolosowski, and Mrs. Sobel were all present. Marquard stated that she was in the room for only three or four minutes. During that time, she saw Dr. Marlowe talking to Mrs. Kolosowski, who was in the bathroom. Dr. Marlowe was trying to get her to come out. Mrs. Sobel told Marquard that Mrs. Kolosowski was having too much pain to come out. Nurse Marquard stated that, when she left the room, Dr. Marlowe was still there.

Nurse Margot Kessner testified that she worked the 11:00 P.M to 7:30 A.M. shift on November 13, 1979. She stated that, prior to the birth of Mrs. Kolosowski's child, she had been in Mrs. Kolosowski's room once for about two or three minutes between 11:15 and 11:20 P.M. As she was making her rounds that night, Nurse Kessner entered Mrs. Kolosowski's room and found her sitting on the floor. It appeared to her that Mrs. Kolosowski was very comfortable. Nurse Kessner told Mrs. Sobel that Mrs. Kolosowski needed to be in bed to have her baby checked. Mrs. Sobel did not respond. Mrs. Kolosowski gave a curt nod to Nurse Kessner. Nurse Kessner then left the room. Nurse Kessner stated that she had not checked the fetal heart tones of Mrs. Kolosowski's baby because it would have been impossible to do so with Mrs. Kolosowski on the floor. Nurse Kessner further stated that she thought about bodily assisting Mrs. Kolosowski up off the floor but felt that it would be an assault. Nurse Kessner stated that she did not remember seeing Dr. Marlowe at all prior to the birth of Mrs. Kolosowski's baby.

Nurse Jan Gustafson testified that she was the charge nurse for the 11:00 P.M. to 7:30 A.M. shift on November 13, 1979. She testified that part of a nurses's duties in monitoring patients is to take the patient's vital signs and heart tones and to time contractions. These signs are to be checked approximately every one-half hour. After receiving her shift report, Nurse Gustafson began making her rounds. When she came to Mrs. Kolosowski's room, only Mrs. Kolosowski and Mrs. Sobel were in the room. Mrs. Kolosowski was sitting on the floor. Nurse Gustafson told Mrs. Sobel that Mrs. Kolosowski could not sit on the floor. Mrs. Sobel replied that they did not do this in Poland and laughed. Mrs. Kolosowski then got up off the floor and went into the bathroom. As Mrs. Kolosowski was getting up it appeared to Nurse Gustafson that she was cramping. Nurse Gustafson then took the blanket which Mrs. Kolosowski had been lying on and left the room. The hospital records indicate that Nurse Gustafson was in the room between 11:20 and 11:25 P.M.

Nurse Gustafson then went to another room where she conducted admitting procedures on several patients. As she was leaving the other room, she saw Mrs. Sobel in the hall crying for help. Nurse Gustafson then went to another room to discard a tray and entered Mrs. Kolosowski's room after the baby had been born. She stated that the first time she saw Dr. Marlowe that night was after the baby was born. She further stated that none of the nurses had reported to her that they had been in Mrs. Kolosowski's room after 11:20 P.M. Additionally, none of the nurses reported having problems with Mrs. Kolosowski that night.

Nurse Nancy Stambaugh testified that, between 11:15 and 11:30 P.M., she was in Mrs. Kolosowski's room several times. She remembered that other

people had been in the room but could not remember who they were. She did not remember seeing Dr. Marlowe in the room. When she was in the room, Mrs. Kolosowski was standing up and walking around.

Plaintiffs presented Dr. Joseph Collea as an expert on obstetrics and gynecology. Dr. Collea testified that the management of Mrs. Kolosowski's labor was below medical standards of practice. The errors began in assessing the baby's due date and in failing to perform an ultrasound to get an accurate due date. Dr. Marlowe also misdiagnosed Mrs. Kolosowski's condition upon entering the hospital as a premature birth which would have to be induced. Further, according to Dr. Collea, it was below standards of practice to fail to monitor the baby when it had been ordered. When Mrs. Kolosowski communicated that she was in pain, someone should have checked to see if she was in labor. Dr. Collea testified that Mrs. Kolosowski's statement of pain and her need to move her bowels were classic symptoms that the baby was about to be born. Dr. Collea stated that Mrs. Kolosowski should have been gently coerced into getting out of the bathroom and into bed. It was Dr. Collea's opinion that, because Mrs. Kolosowski had been a difficult patient, she had been neglected while in labor.

Nurse Kay Bacso testified as a nursing expert. She testified that the nurses' conduct was not acceptable because they had not followed the order to put a fetal heart monitor on Mrs. Kolosowski, they did not check fetal heart tones for 1½ hours before the baby was born, and they did not assist Mrs. Kolosowski into bed.

Dr. Foster Redding, a neurologist, testified that he had examined Robert Kolosowski on August 2, 1984, when Robert was almost five years old. Dr.

Redding found that Robert had impaired intellectual and language functioning and was mildly retarded, with a ballpark IQ of about sixty. He stated that Robert would never go farther than the fourth-grade level in school. Dr. Redding opined that Robert's retardation had been caused by his fall at birth.

Defendants' expert, Dr. Seymour Ziegelman, testified as to the standard of care for an obstetrician gynecologist. Dr. Ziegelman testified that Dr. Marlowe had complied with the standards of practice by being present to render treatment to the patient. It was beyond Dr. Marlowe's control that the patient would not accept the care. He stated that the error in the estimated date of delivery did not have an adverse effect on the delivery of Robert and that the fetal heart monitor, which was never put on Mrs. Kolosowski, was unnecessary.

Defendants also called Dr. John Manica as an expert on child neurology. Dr. Manica testified that he examined Robert and found that he had an IQ in the sixty-to-eighty range. Robert also had diffuse clumsiness in his motor coordination and speech. In Dr. Manica's opinion, Robert's retardation had not been caused by the fracture to his skull at birth.

The jury returned a verdict finding that defendant Dr. Marlowe's malpractice was seventy percent responsible for Robert's injuries and that defendant hospital was thirty percent responsible. The jury further found that Mrs. Kolosowski had not been negligent. The jury awarded Robert $5,000,000, Mrs. Kolosowski was awarded $1,500,000, and Mr. Kolosowski was awarded $500,000. Defendants moved for a judgment notwithstanding the verdict, a new trial, and remittitur on several grounds. The trial court granted defendants' motion for judgment notwithstanding

the verdict on the claims of Mr. and Mrs. Kolosowski and remitted the jury verdict for Robert from $5,000,000 to $106,696.01. All of defendants' other motions were denied.

On appeal, plaintiffs argue that the trial court erred in granting a directed verdict on Jadwiga and Stanley Kolosowski's claim for loss of consortium. Plaintiffs maintain that a parent may obtain redress for the parent's losses arising from the diminished quality of the parent-child relationship.

In deciding whether or not to grant a motion for directed verdict, the trial judge must accord to the nonmoving party the benefit of viewing the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the nonmoving party. *Caldwell v Fox*, 394 Mich 401, 407; 231 NW2d 46 (1975). If the evidence, when viewed in this manner, establishes a prima facie case, the motion for a directed verdict must be denied. *Id.*

A loss of consortium claim encompasses the loss of society, companionship, and services of the person injured. *Washington v Jones*, 386 Mich 466, 472; 192 NW2d 234 (1971). In *Sizemore v Smock*, 430 Mich 283; 422 NW2d 666 (1988), the Michigan Supreme Court held that the common law of Michigan does not recognize a parent's action for loss of a child's society and companionship. Accordingly, based on *Sizemore, supra,* we find that the trial court did not err in granting a directed verdict on the parents' loss of consortium claim in this case.

Plaintiffs further argue that the trial court erred in granting a judgment notwithstanding the verdict on Jadwiga and Stanley Kolosowski's claim for emotional distress they sustained after witnessing their son's injury. We disagree.

When faced with a motion for judgment notwithstanding the verdict the court must view the evi-

dence in a light most favorable to the nonmoving party and decide if the facts presented preclude judgment for the nonmoving party as a matter of law. If the evidence is such that reasonable men could differ, the question is one for the jury and judgment notwithstanding the verdict is improper. *Smart v The New Hampshire Ins Co,* 148 Mich App 724, 731; 384 NW2d 772 (1985), aff'd 428 Mich 236 (1987). A judgment notwithstanding the verdict may be granted only where there is insufficient evidence, as a matter of law, to make an issue for the jury. *Willoughby v Lehrbass,* 150 Mich App 319, 344; 388 NW2d 688 (1986).

Michigan law recognizes a cause of action based on negligence in a parent who witnesses the negligent infliction of injury to his or her child and suffers emotional distress as a consequence. *Wargelin v Sisters of Mercy Health Corp,* 149 Mich App 75, 80; 385 NW2d 732 (1986); *Gustafson v Faris,* 67 Mich App 363; 241 NW2d 208 (1976). The four elements which must be established in order to recover under this cause of action are: (1) the injury threatened or inflicted on the third person must be a serious one, of a nature to cause severe mental disturbance to the plaintiff; (2) the shock must result in actual physical harm; (3) the plaintiff must be a member of the immediate family, or at least a parent, child, or spouse; and (4) the plaintiff must actually be present at the time of the accident or at least suffer shock "fairly contemporaneous" with the accident. *Wargelin, supra,* p 81.

In the instant case, the trial court granted a judgment notwithstanding the verdict on the basis that there had been no proofs submitted at trial that Mr. and Mrs. Kolosowski's shock in witnessing their child's injury resulted in actual physical harm. Based upon our careful review of the evi-

dence of record, we find that the trial court did not err in granting a judgment notwithstanding the verdict to defendants since plaintiffs did not present any evidence at trial showing that Mr. and Mrs. Kolosowski sustained actual physical harm.

Plaintiffs next argue that a judgment notwithstanding the verdict against Mr. and Mrs. Kolosowski's claims was improper since Mrs. Kolosowski herself was a victim of malpractice independent from her son. Plaintiffs further maintain that Mr. Kolosowski, as the spouse of a malpractice victim, may recover the derivative losses he suffered because of the malpractice committed on his wife. We disagree.

Plaintiffs' allegations of a duty owed by defendants and a breach of duty relate to Mrs. Kolosowski's status as a birthing mother and are entwined with the allegations of malpractice with respect to the care of the newborn child, Robert Kolosowski. Furthermore, the evidence of record lacks specific proofs by plaintiffs of any physical injuries or damages independently suffered by Mr. and Mrs. Kolosowski. The plaintiffs' proofs at trial only showed actual physical injury to the child. The only proofs of damages submitted on Mr. and Mrs. Kolosowski's claim center on their distress and concern for their son and do not constitute an independent claim of malpractice. Accordingly, we find that the trial court did not err in granting a judgment notwithstanding the verdict to defendants where there was insufficient evidence to make an issue for the jury on Mr. and Mrs. Kolosowski's independent claim of malpractice. *Willoughby, supra.*

Plaintiffs next argue that the trial court erred in granting defendants' motion for remittitur and thereby reducing the jury verdict for Robert Kolosowski from $5,000,000 to $106,696.01. We agree.

As noted recently by our Supreme Court in *Palenkas v Beaumont Hospital,* 432 Mich 527, 531; 443 NW2d 354 (1989), a trial court's determination whether to grant remittitur is governed by MCR 2.611(E)(1). According to the express language of the rule, remittitur is justified if the verdict is "excessive," i.e., if the amount awarded is greater than "the highest amount the evidence will support." In addition to evaluating whether the jury award is supported by the proofs, the *Palenkas* Court stated a trial judge may also inquire whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained, and whether the amount actually awarded is comparable to awards in similar cases within the state and other jurisdictions. However, the Supreme Court also held that an inquiry which employs the "shock the conscience" standard is inappropriate as it merely involves an expression of the trial judge's personal values and subjective beliefs and in no way relates to the actual conduct of the trial. Conversely, the other inquiries mentioned are significantly more objective. They are potentially verifiable in the record and, therefore, provide at least some basis for appellate review. *Palenkas, supra,* pp 531-533.

The *Palenkas* Court also set forth the standard for appellate review of a trial court's grant or denial of remittitur, holding that a reviewing court must afford due deference to the trial judge and may not substitute its judgment for that of the trial judge absent an abuse of discretion. *Id.,* pp 533-534. Nevertheless, in the present case, we find that the trial court did abuse its discretion in

remitting the jury verdict from $5,000,000 to $106,696.01.

We first note that the trial court made several errors in remitting the instant jury verdict. The trial court incorrectly calculated the investment potential of $5,000,000 at ten percent per year in determining that the jury award was excessive. Under the trial court's calculations, the $5,000,000 lump-sum verdict would yield $14,265,493 by the time that Robert Kolosowski became eighteen years old and $25,173,245 when he became twenty-four. However, the trial court's calculations in determining the excessiveness of the verdict had no basis in Michigan law.

The trial court should have instructed the jury on the reduction of future damages to present value. *Goins v Ford Motor Co,* 131 Mich App 185, 201; 347 NW2d 184 (1983), lv den 424 Mich 879 (1986). Furthermore, in the absence of a request for this instruction, the trial court itself should have reduced the award to present value. *Id.* Thus, in determining if the verdict was excessive, the trial court should have determined the present value of the jury award rather than what the award could have yielded at the investment rate of ten percent per year. Also, the trial court failed to consider inflation in assessing plaintiffs' damages. *Kovacs v Chesapeake & O R Co,* 426 Mich 647, 651; 397 NW2d 169 (1986), reh den 428 Mich 1201 (1987).

The trial court further erred in determining that the highest amount of lost wages supported by the evidence was $293,760, which reflected a salary of $3.35 an hour for life. The trial court then calculated the present value of Robert Kolosowski's lost wages as $33,900.46. The proper factor to be considered in determining lost wages is what the injured person could have earned but for

the injury. *Prince v Lott,* 369 Mich 606, 610; 120 NW2d 780 (1963). In the present case, evidence was presented at trial showing that, had Robert not been injured, he could have been a construction worker or a factory worker. Evidence was also presented that an average construction worker earned $14.80 per hour in 1984. Therefore, the trial court abused its discretion in determining that the evidence only supported a wage of $3.35 an hour.

The trial court further compounded its error by reducing the future lost wages by the amount of income taxes that would have to be paid on the earnings. Unless provided for by statute, courts must disregard income tax consequences in fixing damages for lost future earning capacity in personal injury cases. *Gorelick v Dep't of State Highways,* 127 Mich 324, 341; 339 NW2d 635 (1983). In the absence of such a statutory requirement in this case, the trial court erred in considering income tax consequences in reducing Robert's lost wages.

The trial court further erred by finding that plaintiffs offered almost no evidence to support noneconomic damages for pain and suffering, mental anguish, denial of social pleasures, embarrassment, and humiliation. The trial court clearly abused its discretion by concluding that the highest award that the evidence supported for noneconomic damages was $250,000 before reduction to present value.

The evidence of record reveals that, as a result of his injuries, Robert Kolosowski was rendered mildly retarded and there is little likelihood that he will ever progress past the fourth-grade level in school. Robert has had very slow development and suffers from speech and motor coordination dysfunctions. Due to his handicap, he has been teased

and ridiculed by other children. Robert also complains of frequent headaches. Since he is mentally retarded, it is expected that Robert's life span will be shortened by approximately ten percent. Additionally, Robert's ability to have normal social interactions with others is limited because of his retardation. Thus, based on the proofs submitted by plaintiffs, it is inconceivable that the trial judge could conclude that there was almost no evidence to support Robert's claim for noneconomic damages.

After our thorough examination of the evidence in the record, we find that, while remittitur is appropriate, the trial court abused its discretion in reducing the jury award to $106,696.01.

In reappraising damage awards, the Michigan Supreme Court has followed a rule of just compensation based upon the evidence. *Precopio v Detroit,* 415 Mich 457, 470; 330 NW2d 802 (1982); *Kellom v City of Ecorse,* 329 Mich 303, 308; 45 NW2d 293 (1951). An appellate court reviewing a personal injury award should decide each case by its own facts. Yet, since no trier of fact can value pain and suffering with mathematical certainty, it is appropriate for a reviewing court to look to analogous cases for guidance with respect to noneconomic damages. *Precopio, supra,* pp 470-472.

In assessing damages for future economic and noneconomic losses, a lump sum award must be reduced to its present cash value. *Chesapeake & O R Co v Kelly,* 241 US 485; 36 S Ct 630; 60 L Ed 1117 (1916); *Goins, supra.* There is some dispute as to the discount rate to be used in personal injury cases, such as this one, commenced before October 1, 1986. See *Katch v Speidel Division of Textron, Inc,* 746 F2d 1136, 1142 (CA 6, 1984). For cases commenced on or after October 1, 1986, all future economic and noneconomic losses must be dis-

counted at the statutory rate of five percent. 1986 PA 178, § 6306 (MCL 600.6306; MSA 27A.6306). SJI2d 53.03 provides a five percent discount rate, but there was no companion jury instruction to account for inflation. Since *Kovacs v Chesapeake & O R Co*, 426 Mich 647; 397 NW2d 169 (1986), reh den 428 Mich 1201 (1987), was decided, inflation may be taken into account. *Kovacs, supra,* p 651. See also SJI2d 53.06, added in October, 1987. A number of jurisdictions require a discount rate equal to the yield on a reasonably safe long-term investment available to the average consumer, such as a treasury bond. See, e.g., *Hoskie v United States,* 666 F2d 1353 (CA 10, 1981). This rate (currently approximately nine percent) may then be offset by an allowance for inflation (approximately four percent in recent years). See *Hoskie, supra,* pp 1355-1356, n 2. Under any of these approaches, a five percent discount is appropriate to apply here.

According to the statutory mortality tables, Robert's life expectancy in the absence of his injuries would be seventy years. The trial court, noting Robert's reduced life expectancy as a consequence of his injuries, awarded lost income on the basis of a working life from ages eighteen to sixty-three, or forty-five years. This was improper; plaintiff must be compensated for the lost seven years of his life expectancy both in terms of the income he would have produced as well as the enjoyment of life that will thus be lost. Moreover, in light of the limitations on mandatory retirement under 29 USC 623, plaintiff must be credited with having a working life to his normal life expectancy, or from age eighteen to seventy, a total of fifty-two years.

Dividing the $5,000,000 jury verdict by seventy years results in a figure of $71,428.57 per year. Since Robert was approximately six years old at

the time of trial, the award for past losses is $428,571.42, and the remainder of the 5,000,000 must be for future losses. Using the five percent discount rate, and employing the interest table at MCLA, Tables, 1988 Cum Supp, 1989 pocket part p 42 (and extrapolating to account for plaintiff's life expectancy of sixty-four years after judgment), the present value of the future losses, added to the figure for past losses, yields a total of approximately $1,800,000. We must now consider whether that amount is excessive.

We first examine Robert's economic losses. Economic losses include lost wages, loss of earning capacity, and past and future expenses associated with the plaintiff's injury. Obviously, this plaintiff did not sustain a present wage loss. Further, the record is devoid of evidence regarding past or future expenses for his care. The only determination to be made with regard to economic losses is the highest award reasonable on the proofs regarding Robert Kolosowski's loss of earning capacity.

Damages as to future earnings are measured by what the plaintiff could have earned but for the disabling injury. *Prince v Lott*, 369 Mich 606; 120 NW2d 780 (1963). A plaintiff has a duty to mitigate his damages, however. Therefore, in determining loss of earning capacity, these "but for" earnings should be offset by wages which it may reasonably be anticipated the plaintiff will earn.

In this case, the proofs were such that the jury could reasonably have found that, but for his injury, plaintiff would earn $14.80 per hour in the construction industry, or $30,784 per year. The proofs were also such that the jury could have found that, while Robert would be able to perform low-level unskilled work, the competition for such work would preclude him from entering the work force and becoming a wage earner. Viewed in a

light most favorable to plaintiff, therefore, Robert's lost earning capacity was $30,784 per year. This amount may not be reduced by an allowance for income taxes, there being no statutory authority for such a deduction. *Gorelick v Dep't of State Highways,* 127 Mich 324, 341-342; 339 NW2d 635 (1983); *Cochran v Myers,* 146 Mich App 729, 735; 381 NW2d 800 (1985).

Once again, employing the interest table at MCLA, Tables, 1987 Cum Supp, 1988 pocket part p 24, for principal and five percent interest payments of $1 for each of fifty-two years accumulating until the year Robert will turn eighteen, a current investment of approximately $10.26 is needed.[1] Multiplying that amount by annual wages of $30,784.00 yields the present value of Robert's lost future earning capacity of $315,843.84. We are all in agreement that this amount represents the highest amount that the evidence will support with respect to economic damages. MCR 2.611(E)(1).

However, with respect to noneconomic damages

---

[1] It may be noted that the interest table at MCLA, Tables, 1987 Cum Supp, 1988 pocket part p 24, ends at the sixtieth year after judgment, whereas in this case present value must be computed until the sixty-fourth year after judgment (the year plaintiff, age six at the time of trial, would turn seventy and reach his life expectancy but for his injuries.) Extrapolating from the five percent column of the interest table, the discount factors for the sixty-first to sixty-fourth years are calculated to be as follows:

| Years | Factor |
|-------|----------|
| 61 | 18.98028 |
| 62 | 19.02884 |
| 63 | 19.07508 |
| 64 | 19.11912 |

Since at the time of the jury's verdict Robert was six years old, the discount factor of 19.11912 must be reduced to reflect that Robert's award for lost earning capacity can accumulate for twelve years, until he reaches working age (eighteen years old). The five percent column of MCLA, Tables, 1987 Cum Supp, 1988 pocket part, p 24, indicates a discount rate of 8.86325 for twelve years. 19.11912 less 8.86325 is 10.25587, or approximately 10.26.

we do not agree. My colleagues are of the opinion that $950,000 in noneconomic damages is the highest amount the evidence will support. I disagree.

Noneconomic losses include past and future disability and disfigurement (*McDuffie v Root*, 300 Mich 286; 1 NW2d 544 [1942]), shame and mortification, mental pain, and anxiety (*Beath v Rapid R Co*, 119 Mich 512; 78 NW 537 [1899]), annoyance, discomfiture, and humiliation (*Grenawalt v Nyphuis*, 335 Mich 76; 55 NW2d 736 [1952]), denial of social pleasure and enjoyments (*Beath, supra*), and fright and shock (*Geveke v The Grand Rapids & I R Co*, 57 Mich 589; 24 NW 675 [1885]).

While I recognize, as did our Supreme Court in *Precopio, supra*, p 471, that no two cases precisely resemble each other, especially where noneconomic damages are involved, there are a few recent court opinions which give some guidance.

In *Northern Trust Co v Cook County*, 135 Ill App 3d 329; 90 Ill Dec 157; 481 NE2d 957 (1985), a male infant developed meningitis and ventriculitis shortly after his birth at a Chicago area hospital, resulting in severe brain injury. At the time of trial, the plaintiff was 7½ years old. He was profoundly and severely retarded, unable to walk or speak, unable to be toilet trained, suffered seizures, underwent surgery to allow full extension of his limbs, developed curvature of the spine, and was receiving special education services consisting of physical, occupational, speech, and music therapy, adapted physical education, and special transportation. The appellate court affirmed the jury verdict of $8,126,711, which included $2,500,000 for the plaintiff's disability and disfigurement and $1,500,000 for past and future pain and suffering.

In *Shaw v United States*, 741 F2d 1202 (CA 9, 1984), a male infant suffered severe brain damage during delivery, resulting in spastic quadripar-

esis, blindness, seizure disorder, and profound mental and physical retardation. The ninth circuit found excessive the nonpecuniary award of $5,000,000 for mental anguish, pain and suffering and destruction of ability to enjoy life. The award was reduced to $1,000,000 since the infant was capable of feeling, could perceive his environment, and was sensitive to auditory stimuli such as music.

In *Glomb v Glomb,* 366 Pa Super 206; 530 A2d 1362 (1987), the Pennsylvania Superior Court affirmed a $1,500,000 general award to a fourteen-month-old girl beaten by a baby sitter. The girl suffered severe bruising on her head and face, brain damage resulting in the loss of normal language and motor skills and, at the age of three, the time of trial, was as yet unable to walk by herself. While noting better than expected progress towards recovery, the court found that she would continue to suffer significant problems for the rest of her life.

In *Colleen v United States,* 843 F2d 3219 (CA 9, 1988), an infant suffered permanent brain damage during delivery. She was later diagnosed as developmentally disabled or handicapped, and when mature was likely to read at a first-grade level, be unable to walk and be unable to be free of assistance and supervision. A United States magistrate rendered an award of $4,500,000 to the infant and her parents which included $300,000 in noneconomic damages to the parents. On appeal, the government challenged as excessive only that part of the award to the parents, which was affirmed. However, the Court of Appeals did remand the award for expert testimony regarding the appropriate discount rate to be applied.

In *Herman v Milwaukee Children's Hospital,* 121 Wisc 2d 531; 361 NW2d 297 (1984), a ten-year-old girl suffered a reduced IQ of eighty-five (dull

normal range) as a result of medical malpractice. A jury awarded the plaintiff $2,609,000 for past and future pain, suffering, and disability. On appeal, the award was reduced to $925,000, as that was the highest amount the plaintiff's attorney requested the jury to award.

In the limited light of these opinions, I conclude that a total judgment for economic and noneconomic damages of $1,800,000, which is the present value of the $5,000,000 amount awarded by the jury, is proper. While that amount may be towards the high end of a reasonable range of awards possible under the facts of this case, it is still within "the highest amount the evidence will support," as provided under MCR 2.611(E)(1) governing remittitur. Accordingly, I would reverse the trial court's remitted verdict of $106,696.01, and order the judgment remitted to $1,800,000 plus statutory interest to plaintiff Robert Kolosowski in full compensation of all of his damages, past and future, as supported by the proofs. I dissent only as to the amount of noneconomic damages to be awarded. We agree that plaintiff will have twenty-eight days from the date of this opinion to file an acceptance of this judgment with the trial court. Otherwise, this matter will be reversed and remanded for a new trial on the issue of damages.

On cross appeal, defendant Dr. Marlowe argues that serious errors which took place in the testimony of plaintiffs' expert witnesses require the granting of a new trial in this case.

Defendant Dr. Marlowe first maintains that the testimony of Dr. Redding was speculative and not premised upon any reasonable degree of medical certainty. We disagree. Dr. Redding performed several tests to determine Robert's approximate IQ and his findings did not vary much from the findings concerning IQ made by defendants' expert.

Furthermore, Dr. Redding's opinion on the causation of Robert's retardation was not speculative. There was sufficient evidence of proximate causation to support Dr. Redding's opinion and the judgment for plaintiffs.

Defendant Dr. Marlowe also contends that one of plaintiff's hypothetical questions to Dr. Redding contained assumed facts which were irrelevant to the instant controversy. We disagree. Our review of the record indicates that the assumed facts were not irrelevant to the actual controversy. Moreover, each one of the facts in the hypothetical were later testified to by Mr. Kolosowski. Thus, we find no error.

Defendant Dr. Marlowe further maintains that Dr. Collea's expert testimony constituted error requiring reversal since it was improperly phrased in terms of a personalized standard.

A treating physician is liable for damages when it is shown that he departed from the standard of care which is known as customary medical practice. *Carbonell v Bluhm,* 114 Mich App 216, 224; 318 NW2d 659 (1982), lv den 417 Mich 871 (1983). The measuring standard of care is founded upon how other doctors in that field of medicine would act and not how any particular doctor would act. *Id.* In testifying as to the appropriate standard of care, an expert's use of the pronoun "I" is improper. *Id.*

In the instant case, the significant portions of Dr. Collea's testimony established the standard of care of an obstetrician and was not based upon what Dr. Collea would have personally done. Although Dr. Collea may have briefly mentioned what he personally would have done, there was sufficient evidence presented by plaintiffs on the appropriate standard of medical care and we find no error requiring reversal.

Defendant Dr. Marlowe further maintains that the expert testimony of Robert Ancell deprived him of a fair trial since it was based upon referenced records which did not support Ancell's testimony. However, defendant did not object to the admission of Ancell's testimony regarding average wages at trial. Under such circumstances, this Court will not afford defendant any relief absent manifest injustice. *Francisco v Manson, Jackson & Kane, Inc,* 145 Mich App 255, 260; 377 NW2d 313 (1985), lv den 424 Mich 872 (1986). Furthermore, Mr. Ancell gave several sources for his wage figures and did not specifically mention that the statistics were taken from the Department of Labor statistics with which defendant takes issue. Thus, we find no manifest injustice.

Defendant Dr. Marlowe also contends that Mr. Ancell's testimony was conjectural and speculative. We disagree. Mr. Ancell's testimony was not conjectural or speculative. When the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. *Allison v Chandler,* 11 Mich 542, 554 (1863); *Body Rustproofing Inc, v Michigan Bell Telephone Co,* 149 Mich App 385, 391; 385 NW2d 797 (1986). In this case, the future lost earnings of the injured minor could not be ascertained with complete certainty. Thus, under the facts and circumstances of this case, it was not improper or unreasonable to present evidence on what an average semi-skilled or skilled laborer earns.

Defendant Dr. Marlowe further contends that Nurse Bacso impermissibly testified as to the standard of care of a physician and that she further improperly testified as to what she personally would have done rather than the standard of care

for nurses in general. However, while defendant objected to Nurse Bacso's qualifications as an expert on nursing, he did not object to her testifying as to the standard of care for a doctor or to her stating what she personally would have done. Since defendant did not make a specific objection to this testimony at trial, we will not afford any relief absent manifest injustice. *Francisco, supra,* p 260. Furthermore, nurse Bacso's reference to health care professionals was not error seen from the context of her testimony in which she repeatedly referred to nurses and not doctors. Thus, no manifest injustice is presented.

Defendant Dr. Marlowe next argues that plaintiffs' counsel's arguments to the jury and trial conduct deprived him of a fair trial. We disagree.

In *Reetz v Kinsman Marine Transit Co,* 416 Mich 97, 102-103; 330 NW2d 638 (1982), the Michigan Supreme Court stated:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted.

Defendant Dr. Marlowe maintains that plaintiffs' counsel improperly stated that defense counsel was being unfair in reading only portions of

deposition testimony when impeaching witnesses on cross-examination. However, MRE 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Thus, plaintiffs' objections and comments at trial regarding defense counsel's failure to read all pertinent portions of the deposition testimony had basis in Michigan law and was not error. Plaintiffs' counsel was entitled to object and request that defense counsel introduce any other part of the deposition testimony which should have been contemporaneously considered by the jury on fairness grounds.

Defendant Dr. Marlowe further contends that plaintiffs' counsel improperly suggested to the jury that defendant Dr. Marlowe had falsified medical records.

In *Reetz, supra,* p 109, the Michigan Supreme Court stated:

> If, as in this case, the testimony of a witness for the plaintiff directly contradicts the testimony of a witness for the defendant, and there is no reason to believe that an honest mistake has been made, so that one witness must be fabricating, each counsel has the right to argue that his witness speaks the truth while the other presents a fabrication.

In the present case, plaintiffs' counsel argued that defendant Dr. Marlowe, in conjunction with the hospital nurses, had created a false medical record that indicated that Mrs. Kolosowski had

received constant attention and had been told numerous times to get out of the bathroom and into bed. The allegedly falsified record was presented by plaintiffs and admitted as an exhibit. Plaintiffs also produced a second hospital record, purportedly the original, which contained no such evidence of numerous visits to Mrs. Kolosowski's room. Furthermore, the testimony at trial did not appear to support the comments written on defendants' version of the medical records. Accordingly, we find that the evidence substantiated plaintiffs' claim of false documentation and that plaintiffs' counsel's arguments were not improper.

Defendant Dr. Marlowe next argues that the trial court erred in denying his motion for a judgment notwithstanding the verdict on the basis that Mr. and Mrs. Kolosowski's claims were barred by the statute of limitations. However, we need not address this issue on appeal since we have already determined that a judgment notwithstanding the verdict was properly granted against Mr. and Mrs. Kolosowski's claims on other grounds.

Defendant Dr. Marlowe next argues that the trial court erred by improperly submitting a portion of plaintiffs' case to the jury and by denying his motions for a partial directed verdict and a judgment notwithstanding the verdict. Defendant Dr. Marlowe maintains that paragraphs 20(a) and (b) of plaintiffs' amended complaint should have been stricken by a directed verdict and that the trial court's error was compounded when the court refused to grant a judgment notwithstanding the verdict. We disagree.

The standard of review by this Court for a denial of a motion for a directed verdict and a motion for a judgment notwithstanding the verdict is the same. This Court must give the nonmoving party the benefit of every reasonable inference

that could be drawn from the evidence. If, in viewing the evidence in a light most favorable to plaintiff, reasonable minds could differ as to whether a plaintiff has met his or her burden of proof, neither a directed verdict nor a judgment notwithstanding the verdict is appropriate and the case should be decided by the jury. *Dickerson v Nichols,* 161 Mich App 103, 107; 409 NW2d 741 (1987).

In paragraphs 20(a) and (b) of plaintiffs' amended complaint, plaintiffs alleged that a reasonable and prudent obstetrician, in circumstances similar to those confronted by defendant Dr. Marlowe, would have made arrangements to have his patient examined and placed in a labor bed. Plaintiffs further alleged that defendant Dr. Marlowe failed to make such arrangements and that his failure constituted a breach of the acceptable standard of care. Viewing the evidence of record in a light most favorable to plaintiffs, reasonable minds could differ as to whether Dr. Marlowe failed to make adequate arrangements to get Mrs. Kolosowski examined and placed into the labor bed. Therefore, we find that the trial court did not err in denying defendant Dr. Marlowe's motions for a directed verdict and judgment notwithstanding the verdict on this issue.

Defendant Dr. Marlowe lastly argues that a new trial should be granted since it was inappropriate for the trial court to grant plaintiff's request for a jury instruction on mental anguish, SJI2d 50.02.

A properly requested standard jury instruction must be given if it accurately states the law and if it is applicable to the case. *Houston v Grand Trunk W R Co,* 159 Mich App 602, 608; 407 NW2d 52 (1987). The determination of whether a requested jury instruction is applicable and accurately states the law is within the discretion of the

trial court. *Id.,* p 609. If the jury instruction is erroneous or inadequate, reversal is required only where failure to reverse would be inconsistent with substantial justice. *Willoughby, supra,* p 336.

Based upon review of the record, I find that the trial court did not abuse its discretion in determining that plaintiffs' requested jury instruction on mental anguish accurately stated the law and was applicable to this case. Plaintiffs' proofs adduced sufficient evidence to warrant the instruction on mental anguish. Furthermore, even if the instruction were erroneous, I would find no substantial injustice to defendant requiring reversal.

I would affirm in part and reverse in part. Additionally, I dissent with respect to the proper amount to be awarded for noneconomic damages.